# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 11 B 33413** |
| **SGK VENTURES, LLC,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **OFFICIAL COMMITTEE OF** | ) | |
| **UNSECURED CREDITORS OF SGK** | ) | |
| **VENTURES, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary No. 13 A 01411** |
| | ) | |
| **NEWKEY GROUP, LLC, et al.,** | ) | |
| | ) | |
| Defendants | ) | |

### Memorandum of Decision on Motions to Grant Standing and to Dismiss

This adversary proceeding is before the court on two motions, seeking conflicting relief, filed in the Chapter 11 bankruptcy case of SGK Ventures, LLC.[1]  A motion of the Official Committee of Unsecured Creditors seeks a grant of standing, on behalf of SGK's bankruptcy estate, to pursue this adversary proceeding, which alleges, among other things, that the defendants participated in fraudulent conveyances.  The defendants have moved to dismiss the proceeding, arguing alternatively that the Committee lacks standing, that the proceeding is untimely, and that the complaint's allegations are insufficient to state claims on which relief can be granted.  As discussed below, the Committee is entitled to a grant of standing, and the defendants' other arguments for dismissal do not preclude a

---

[1] SGK Ventures, LLC was named Keywell, LLC at the outset of the bankruptcy case.  In this opinion, the debtor is referred to as "SGK" even where the earlier "Keywell" name would have been used in the relevant documents.

trial on the merits.  The Committee's motion will therefore be granted and the defendants'
motion granted only in part.

## Jurisdiction

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive
jurisdiction" of all cases under the Bankruptcy Code (Title 11, U.S.C.).  The district
courts may refer these cases to the bankruptcy judges for their districts under 28 U.S.C. §
157(a), and the District Court for the Northern District of Illinois has made such a refer-
ence through its Internal Operating Procedure 15(a).

After a case is referred to a bankruptcy judge, the judge is authorized by 28 U.S.C.
§ 157(b)(1) to hear and determine "core proceedings" arising under the Bankruptcy Code,
and § 157(b)(2) gives several examples of core proceedings.  For other, "non-core" pro-
ceedings, § 157(c)(1) provides that the bankruptcy judge should not enter judgment but
rather submit proposed findings of fact and conclusions of law to the district court for its
issuance of judgment.  These statutory provisions are not completely consonant with con-
stitutional limits on a bankruptcy judge's authority.  Under Article III of the Constitution,
a bankruptcy judge, lacking the life-tenure and protected compensation that Article III
requires for federal judges, may only enter final judgment on matters of "public right,"
even though the statute lists as core proceedings matters of "non-public right." *Stern v.
Marshall,* 131 S. Ct. 2594, 2611–12 (2011).

The present adversary proceeding involves matters that may not be subject to final
adjudication by a bankruptcy judge under the *Stern* decision.  However, because the pre-
sent ruling is interlocutory, there is no need to decide that question.  *Cf. United States v.
Durensky (In re Durensky),* 519 F.2d 1024, 1029 (5th Cir.1975) ("An order denying a
motion to dismiss . . . is perhaps unique in its incapacity permanently to affect the rights
of the moving party, for jurisdictional defects may be recognized by a court at any time,
on the motion of the parties or on its own motion.").  This court, then, has the authority to
issue a ruling on the pending motions.

## Lack of Standing

The initial question, raised by both motions, is whether the Creditors' Committee
should be given standing to pursue this adversary proceeding.  The opposing motions on
this question both recognize that the causes of action set out in the Committee's com-
plaint are legal interests of SGK's bankruptcy estate, and that control of the estate is
within the authority of the bankruptcy trustee or in this Chapter 11 case, SCK itself, as
debtor in possession.  *See* §§ 541 (a)(1), 704(a), 1106(a), 1107(a), 1108 of the Bank-

ruptcy Code, Title 11 U.S.C (2012); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987). The parties agree as well that, as a result, the trustee or debtor in possession ordinarily has the sole authority to litigate claims of the estate. They disagree, though, on three separate questions involving the Committee's standing in the present adversary proceeding: (1) whether the court has any authority to confer trustee standing on another party; (2) whether, if so, the court has previously conferred such derivative standing on the Committee; and (3) whether, if not, such standing can be conferred now. The answer to these questions is that derivative standing is permissible, was not previously granted, but should be granted now.

> (1) *The trustee's standing to bring an action on behalf of a bankruptcy estate may be conferred on another party.*

The concept of a derivative suit—one brought by someone exercising the standing that would otherwise belong to another—is common in corporate litigation. If the management of a corporation refuses to bring a cause of action, and if various safeguards are met, a shareholder of the corporation may bring the action on the corporation's behalf, with any recovery being for the benefit of the corporation rather than for the shareholder individually. *See generally,* Ann M. Scarlett, *Shareholder Derivative Litigation's Historical and Normative Foundations*, 61 Buffalo L. Rev. 837 (2013). Bankruptcy presents a similar situation. The trustee of a bankruptcy estate, like corporate managers, may fail to pursue litigation that is in the estate's best interests, and courts presiding over bankruptcy cases have allowed for such litigation to be brought derivatively, developing principles like those applicable to shareholder derivative suits, long before the enactment of the Bankruptcy Code. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 570 (3d Cir. 2003) (en banc) (collecting pre-Code authority); 7 *Collier on Bankruptcy* ¶ 1103.05[6][a] (16th ed. 2014) ("Nearly all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession . . . ."); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (noting the similarity between derivative standing in the corporate and bankruptcy contexts).

Of particular relevance here, the Seventh Circuit has repeatedly recognized the availability of derivative trustee standing. *In re Consol. Indus. Corp.*, 360 F.3d 712, 716 (7th Cir. 2004); *Fogel*, 221 F.3d at 965–66; *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990). Nor is this recognition merely dicta. In *Fogel*, the court directed that if the creditor in that case were unable to procure the trustee's agreement to prosecute a claim on behalf of the estate, the creditor "can prosecute the claim itself, in conformity with the procedure set forth in *In re Perkins* . . . ." 221 F.3d at 966.

The defendants' argument, though, is that all of this case law has been overturned by two Supreme Court decisions, *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1 (2000), and *Law v. Siegel,* 134 S. Ct. 1188 (2014). Not so. *Hartford Underwriters* decided that an individual creditor could not pursue—for itself—a claim for compensation that § 506(c) of the Bankruptcy Code authorizes the trustee to pursue. The decision does not address the quite different question of whether a party could be allowed to exercise the trustee's right under § 506(c) derivatively on behalf of the estate. To the contrary, the decision expressly declines to address the question of derivative standing. It notes the practice of granting derivative standing in fraudulent transfer actions and says that this practice is not relevant to its decision. *Hartford,* 530 U.S. at 13 n.5 ("We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery . . . . [The practice of granting derivative standing to pursue fraudulent transfer actions] has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today.").

*Law v. Siegel* is similarly not on point. It holds that § 105(a) of the Bankruptcy Code, though granting courts authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," does not allow courts to take action expressly prohibited by the Code. Section 522(k) of the Code expressly prohibits an award of administrative expenses from a debtor's exempt property, and *Law* held that a surcharge of exempt property to pay such expenses was improper. *Law,* 134 S. Ct. at 1195 ("[T]he Bankruptcy Court's 'surcharge' was unauthorized if it contravened a specific provision of the Code. We conclude that it did."). There is no provision of the Bankruptcy Code prohibiting a grant of derivative trustee standing, and so *Law* has no bearing here.

Because the Supreme Court has not overruled the Seventh Circuit decisions recognizing derivative trustee standing, those decisions are binding, and the defendants' argument that derivative standing cannot be granted must be rejected.[2]

---

[2] The defendants also make a constitutional argument—that derivative trustee standing would violate the principle of separation of powers, arguing (1) that only the United States Trustee, an appointee of the Executive Branch, has the power to appoint a trustee with responsibility for the administration of the estate and (2) that allowing derivative standing would be a usurpation of this authority by the Judicial Branch. This novel argument, however, is mistaken from the outset. The Bankruptcy Code never granted the Executive Branch an exclusive power to appoint trustees. United States Trustees were introduced originally only in certain pilot jurisdictions, and even now do not operate in North Carolina or Alabama. In those states, as in the non-pilot jurisdictions when the Code first went into effect, trustee appointment is through Bankruptcy Admin-

(2) *The trustee's standing to bring an action on behalf of SGK has not already been conferred on the Committee.*

At the outset of this bankruptcy case, SGK moved for authority to use cash that was claimed as collateral by two of the defendants in this proceeding, NewKey Group, LLC ("NewKey I") and NewKey Group II, LLC ("NewKey II"), jointly referred to as "NewKey." The motion proposed an order that allowed SGK to use cash collateral, but with a prohibition against the Committee challenging the validity of NewKey's liens unless the Committee filed an objection within 60 days of its appointment. *See* Debtor's Mot. for use of Cash Collateral, Sept. 24, 2013, Docket No. 11. The Committee, SGK, and NewKey later agreed on a revised cash collateral order, which the court entered, including the following provision on actions by the Committee:

> Notwithstanding anything to the contrary contained in this Order, any action, claims, or defense (hereinafter, an "Objection") that seeks to object to, challenge, contest, or otherwise invalidate or reduce, whether by avoidance, setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind, (a) the existence, validity, or amount of the [indebtedness] owing to [NewKey] as of the Petition Date; and/or (b) the extent, legality, validity, perfection, or enforceability of the [prepetition security interests] of either [NewKey I or NewKey II] shall be filed with the Court (x) solely with respect to perfection and attachment issues, by the Committee, or any party in interest with requisite standing, within seventy-five (75) calendar days from the date of appointment of the Committee by the United States Trustee (the "Perfection Objection Period"), or (y) with respect to any matters or issues not relating to perfection or attachment, by the Committee, or any party in interest with requisite standing within ninety (90) days from the date of appointment of the Committee (the "Objection Period"). It is understood and agreed by the Debtor that the Committee has, and the Court hereby endorses the Committee's, standing the [sic, should be "to"] file and prosecute any objection. If no Objection is timely filed by the end of the Objection Period or the Perfection Objection Period, as applicable, as to the [NewKey indebtedness] or the [NewKey prepetition security interests], or an Objection is timely filed but denied, then the [indebtedness]

---

istrators, who are part of the Judicial Branch. *See* Dan J. Schulman, *The Constitution, Interest Groups, and the Requirements of Uniformity: The United States Trustee and the Bankruptcy Administrator Programs*, 74 NEB. L. REV. 91, 93 (1995). There has never been a separation of powers in bankruptcy administration that would be violated by derivative standing.

owing to [NewKey] as of the Petition Date shall be deemed allowed in full, shall be not subject to any setoff, recoupment, counterclaim, deduction, subordination, or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and [NewKey's prepetition security interests] shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes. Within the applicable time periods, the Committee shall be permitted to appeal any rulings by the Court relating to an Objection.

Cash Collateral Order ¶ 8, Oct. 17, 2013, Docket No. 113.

The Committee argues that this language—particularly the sentence stating that "the Court hereby endorses the Committee's, standing [to] file and prosecute any objection"—conferred standing to prosecute the claims set out in its amended complaint. Although this language, out of context, might seem to support the Committee's position, and although the context is complex, the Committee's reading is not persuasive. The term "Objection" is given a specific, limited meaning in the order—it encompasses only legal proceedings that would limit either (a) the amount that NewKey was owed prepetition or (b) any interest that NewKey asserted in SGK property to secure this prepetition indebtedness. For objections, so limited, that challenged perfection and attachment of security interests, the Committee was given 75 days from the date of its appointment to act; for other such objections, either to the amount of NewKey's claims or to its asserted security interests, the Committee was given 90 days from its appointment. Only for these limited objections does the order accord a "Court endorsement" of the Committee's standing. Nothing in the order purports to accord standing to the Committee to institute any other action, particularly an action that the Bankruptcy Code assigns to the trustee or debtor in possession.[3] Nor does that order suggest that claims against individuals may serve to limit NewKey's claims or security interests.[4] The standing of the Committee to bring actions on behalf of the estate has not yet been determined.

_____

[3] In contrast to claims on behalf of the estate—which, as noted above, the Code assigns to the trustee or debtor in possession as part of estate administration—the Code allows any party in interest to oppose claims that creditors make against the estate or its property. *See, e.g.,* § 502(a) (providing that claims are allowed "unless a party in interest . . . objects"); Fed. R. Bankr P. 3012 ("The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest . . . ."). There was, then, likely no need for the court to "endorse" the Committee's standing to challenge NewKey's claims.

[4] The Committee argues that its complaint seeks a determination that the individual defendants are alter egos of NewKey, so that the avoidance actions against them

(3) *The Committee should be allowed to exercise the trustee's standing*.

In *Perkins*, the Seventh Circuit set out three elements for derivative trustee standing to pursue a cause of action held by the bankruptcy estate:

> (a) the trustee unjustifiably refuses a demand to pursue the action;
> (b) the creditor establishes a colorable claim or cause of action; and
> (c) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the trustee.

902 F.2d at 1258. The court went on to note that, in the case before it, the party who sought derivative trustee standing had established none of these elements before filing its standing motion; the court then stated, "When a third party tries to assert an action still vested in the trustee, the court should dismiss the action." *Id*.

Several counts of the Committee's amended complaint—Counts III, VII, and XV-XIX—seek only to reduce the claims that NewKey has asserted against the SGK estate. If court approval of the Committee's standing to bring these counts were necessary, it was granted in the cash collateral order, and the defendants do not challenge the Committee's standing as to these counts. The remaining counts—I-II, IV-VI, and VIII-XIV—are against individual shareholders of SGK and NewKey, alleging that they received avoidable transfers and breached fiduciary and statutory duties. The defendants assert that, as to these claims, the Committee failed to establish any of the *Perkins* elements before filing this adversary and so the adversary should be dismissed.

The second element—whether the Committee established colorable claims—is discussed below, in connection with the defendants' motion to dismiss. As set out in that discussion, all of the challenged counts, except Counts XII, XIII, XIV, and XVI, state a colorable claim, and so satisfy that element.

The defendants' challenges to the Committee's satisfaction of the two remaining *Perkins* elements are primarily based on timing. To comply fully with the first element,

---

should be considered claims against NewKey. If this alter ego argument were accepted, the avoidance actions would reduce NewKey's claims pursuant to § 502(d) of the Bankruptcy Code. That subsection disallows creditor claims until the creditor has satisfied any avoidance judgment. The difficulty with this alter ego argument is that the court has made no finding that NewKey is responsible for the claims asserted against the individual debtors—under an alter ego theory or otherwise—and no such relief is even sought in the Committee's complaint. The cash collateral order, then, could not have been intended to permit the Committee to pursue claims against the individual defendants as a way of reducing NewKey's claims under § 506(d).

7

the Committee would have needed to have made a demand on SGK, as debtor in posses-
sion, and to have been refused, before it filed this adversary proceeding on December 17,
2013. Adversary Docket No. 1. The Committee took two relevant actions before that
date.

First, the Committee filed a limited objection to a motion by SGK to sell the bulk
of its assets. *See* Order Allowing Filing Under Seal, Nov. 28, 2013,Docket No. 258 (the
objection itself is attached as Exhibit 15 to the Committee's brief in support of its motion
for standing, Adversary Docket No. 117). This objection informed the parties, including
SGK, of the Committee's belief "that potential claims lie against insiders and equity
stakeholders of both NewKey and [SGK]"; the objection further stated that fraudulent
transfer claims were among those anticipated. Obj. at 35, ¶¶ 56–57. In response to this
objection, the court ordered that the net proceeds of the sale be held in escrow rather than
disbursed to NewKey. Sale Order at 23 ¶ 14, Dec. 12, 2013, Bankruptcy Docket No. 313.

Second, also before filing, counsel for the Committee discussed with SGK's at-
torney the Committee's intention to file an avoidance action against one of the insiders
who was later named as a defendant. This discussion was outlined by SGK's counsel in
an email. Comm. Br. in Support of Mot. to Grant Standing, Ex. 14. The email states that
in the discussion, SGK's attorney (1) "confirmed that the debtor-in-possession would not
be prosecuting" the Committee's planned action against the insider; (2) stated that SGK
would "agree [to], or at least not oppose, the committee's prosecution" of such an action;
and (3) acknowledged that "any demand by the committee with respect to the other
Committee Avoidance Actions would have been perfunctory." The email states that the
reasons for SGK's position on Committee prosecution were "obvious," and another email
from SGK's counsel, Ex. 18 to the Committee's brief, gives the reason explicitly: an
"undeniable conflict of interest." SGK's obvious conflict was that individual defendants
proposed by the Committee were part of SGK's management.

Some decisions dealing with the first *Perkins* element—the trustee's refusal of a
demand to pursue an action—have excused compliance if the demand would have been
futile. *See, e.g., Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In
re Nat'l Forge Co.)*, 326 B.R. 532, 544 (W.D. Penn. 2005). But even if that limitation
were not available under *Perkins*, the Committee's statement of its intention to bring ac-
tion against insiders of SGK and SGK's oral refusal to bring an action against one of the
insiders are sufficient to satisfy *Perkins*: before filing its complaint against the individuals
associated with SGK, the Committee had obtained a sufficient indication from SGK that
it would not bring such a complaint.

The remaining *Perkins* element—obtaining leave of court to exercise derivative
trustee standing—has obviously not been timely satisfied by the Committee; the Commit-

tee sought leave only after filing its complaint.  One decision, *In re Baltimore Emergency Services II, Corp*., 432 F.3d 557 (4th Cir. 2005), holds that this untimeliness is fatal to a request for derivative standing.  The great majority of decisions, however, find that the court has discretion to grant retroactive derivative standing.  One of the most recent, expressly disagreeing with *Baltimore Emergency Services,* is *PW Enter. v. North Dakota Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 903–04 (8th Cir. 2008).  Others are collected in *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.),* 326 B.R. 532, 545-546 (W.D. Pa. 2005).  Among the reasons for allowing this discretion are (1) if the request for leave is otherwise appropriate, dismissing a complaint for failure to seek leave in advance may simply result in a refiling of both the request for leave and the complaint, generating unnecessary expense and delay, *see Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co., Inc.)*, 207 B.R. 899, 905 (9th Cir. BAP 1997); and (2) the party that failed to timely obtain derivative standing may have been acting in good faith under an impending deadline for filing its complaint, *see Catwil Corp. v. Derf II (In re Catwil Corp.)*, 175 B.R. 362, 365 (Bankr. E.D. Cal. 1994) (noting the imminent expiration of a statute of limitations).

Both of these reasons for granting retroactive standing are present here.  Since there is otherwise good reason to grant derivative standing, enforcing the prior-leave requirement would likely result simply in a new standing motion and the refiling of the dismissed complaint.  More significantly, the Committee was acting, prior to filing the complaint, under the belief that the cash collateral order included potential actions against insiders among the "Objections" that the Committee was given standing to pursue.  As SGK's counsel noted in email correspondence, this belief, though erroneous, "was reasonable and understandable." Comm. Br. in Support of Mot. to Grant Standing, Ex. 18 at 3.  But if actions against insiders had been "Objections" under the order, these actions would have to have been filed within the 90-day deadline established by the order.  The Committee's December 17 complaint was filed only two weeks before the deadline expired.[5]

The language in *Perkins* does not mandate denial of all untimely motions for derivative standing.  It says only that such motions "should" be denied, not that they must be.  Moreover, *Perkins* adopted its elements for derivative standing from the general case law, specifically *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988), which identifies the elements as "relevant factors."  Accordingly, *Perkins* is best seen as consistent with the majority of the decisions holding that, though it is not appropriate as a

---

[5] The Committee was appointed on October 3, 2013 (Bankruptcy Docket No. 52); 90 days from that date was January 1, 2014.

rule, *see Spaulding Composites*, 207 B.R. at 904 ("[T]he better practice is for the plaintiff
to secure approval before filing the complaint."), retroactive derivative standing may be
allowed in unusual cases. This is such a case. The Committee's motion to grant standing
will be granted, and the defendants' argument for dismissal of the Committee's complaint
for lack of standing will be rejected.

### Untimeliness

Three counts of the Committee's complaint—I, XI, and XII—allege causes of ac-
tion under Illinois statutes that are subject to periods of repose. A statute of repose re-
quires that an action be commenced within a fixed period of time, "regardless of a poten-
tial plaintiff's lack of knowledge of his or her cause of action." *DeLuna v. Burciaga*, 857
N.E.2d 229, 237 (Ill. 2006). A period of limitation, in contrast, is not fixed, and may run
from a variable date, such as the accrual of a claim based on the claimant's becoming
aware of an injury. *Id*. The defendants move to dismiss Counts I, XI, and XII on the
ground that their allegations fall outside of applicable periods of repose. Although un-
timeliness of pleading is an affirmative defense, dismissal on this ground "is appropriate
when the plaintiff pleads himself out of court by alleging facts sufficient to establish the
complaint's tardiness." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d
671, 674–75 (7th Cir. 2009). However, none of the counts challenged by the defendants
as untimely can be dismissed on this basis.

Count I of the complaint asserts a cause of action under the Uniform Fraudulent
Transfer Act, enacted in Illinois as 740 Ill. Comp. Stat. Ann. 160/1 to 12 (West 2014)
(the "IUFTA"). Count I is titled "Constructive Fraud," and its allegations correspond to
§ 5(a)(2) of the IUFTA, which renders a transfer fraudulent if made by a debtor (1) with-
out receiving reasonably equivalent value in exchange and (2) at a time when the debtor
was either in specified financial difficulty or would become so as a result of the transfer.
This contrasts with Count II, titled "Actual Fraud," which makes allegations correspond-
ing to § 5(a)(1) of the IUFTA, under which a transfer is fraudulent if made "with actual
intent to hinder, delay, or defraud any creditor of the debtor."

There is an important difference between the filing deadlines applicable to Counts
I and II. For the "actual intent" allegations of Count II, claimed under § 5(a)(1), both a
statute of repose and a statute of limitations are applied by § 10(a) of the IUFTA. Section
10(a) states that a cause of action under § 5(a)(1) is extinguished unless it is brought
within 4 years after the transfer is made (a period of repose) "or, if later, within one year
after the transfer . . . was or could reasonably have been discovered by the claimant" (a
period of limitation). In contrast, for Count I, brought under § 5(a)(2), there is no statute
of limitation. Section 10(b) of the IUFTA makes "constructive fraud" claims subject

10

only to the 4-year period of repose; a claimant's lack of knowledge does not extend the
period before extinguishment of the claim.  The effect of § 10, then, is to create a special
statutory tolling system for fraudulent transfer recoveries, with a four-year period of re-
pose for transfers made with either actual or constructive fraudulent intent, and a one-
year limitation period based on the claimant's discovery of the transfer that supersedes
the period of repose, only for actually fraudulent transfers.

If § 10 were the only relevant Illinois statute bearing on the filing deadline for
Count I, the count would be subject to dismissal, since it alleges as constructively fraudu-
lent two large distributions to SGK equity holders that occurred in 2007 and 2008, more
than four years before this proceeding was filed.  There is, however, another applicable
Illinois statute, 735 Ill. Comp. Stat. Ann. 5/13-215 (West 2014), that tolls filing deadlines
in situations of fraudulent concealment.  It states:

> If a person liable to an action fraudulently conceals the cause of such ac-
> tion from the knowledge of the person entitled thereto, the action may be
> commenced at any time within 5 years after the person entitled to bring
> the same discovers that he or she has such cause of action . . . .

Count I contains allegations of fraudulent concealment, whose sufficiency is dis-
cussed below, but the defendants' first response is that § 13-215 does not apply to the
IUFTA.  That response is not correct.  In *DeLuna*, the Illinois Supreme Court considered
whether § 13-215 applied to a claim of legal malpractice.  857 N.E.2d at 233.  That claim,
the court stated, was subject only to a 6-year statute of repose, which had expired.  The
defendant's position was that § 13-215 could not apply to a statute of repose; he argued
that the plaintiff's knowledge of a claim is not relevant to repose deadlines and so fraudu-
lent concealment, since it bears only on the plaintiff's knowledge, was irrelevant.  The
court disagreed, stating flatly, "We see no reason why section 13-215 should not apply to
statutes of repose . . . ."  857 N.E.2d at 243.  And although the court noted that it would
be particularly appropriate for fraudulent concealment to toll repose deadlines in actions
against fiduciaries, it did not limit its holding to the fiduciary context: "[T]here would be
an obvious and gross injustice in a rule that allows a defendant—particularly a defendant
who stands in a fiduciary relationship to the plaintiff—to conceal the plaintiff's cause of
action and then benefit from a statute of repose."  857 N.E.2d at 242.  *DeLuna*, then, es-
tablishes that § 13-215 applies generally, as later decisions applying Illinois law have
recognized.  *See Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1009 (Ill. 2007)
("Section 13–212 explicitly recognizes that fraudulent concealment tolls the running of
the statute of limitations/repose."); *J.S. Reimer, Inc. v. Vill. of Orland Hills*, 990 N.E.2d
831, 842 (Ill. App. Ct. 2013); *Putzier v. Ace Hardware Corp.*, 2014 WL 2928236, at *8
(N.D. Ill. June 25, 2014).  The defendants cite decisions from other jurisdictions that may
apply fraudulent conveyance law more narrowly, but those decisions cannot limit the ap-

plication of § 13-215 as interpreted by the Illinois Supreme Court.[6]

The defendants make a further argument that, despite the general applicability of § 13-215, the IUFTA should be excepted from its coverage because § 12 of the Act provides that it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this Act among states enacting it." This provision enjoins courts interpreting the language of the IUFTA to be mindful of the manner in which courts of other states have construed that language, but it does not prevent other statutes from bearing on filing deadlines. So, for example, several states have enacted filing deadlines that differ from those in the official version of § 10.[7] More importantly, § 108(a) of the Bankruptcy Code itself provides for an extension of non-bankruptcy filing deadlines, completely applicable to the IUFTA. *See Maxwell v. Barounis (In re Swiontek),* 376 B.R. 851, 859 n.5 (Bankr. N.D. Ill. 2007) ("§ 108(a) of the Bankruptcy Code provides a trustee with additional time to file an IUFTA action if the statute of limitations has not expired before the bankruptcy petition is filed."). Section 13-215 has the same effect.[8]

Since fraudulent concealment may apply to the filing deadline in § 10(b) of the IUFTA, the next question in determining the timeliness of Count I is whether the com-

---

[6] A federal court applying state law is, of course, bound to apply the interpretation of that law given by the state's highest court. *West v. Am. Tel. & Telegraph Co.*, 311 U.S. 223, 236 (1940).

[7] These include: Ala. Code § 8-9A-9 (2014) (10-year statute of repose for actual fraudulent transfers of real property and six years for actual fraudulent transfers of personal property), Ark. Code Ann. §§ 4-59-209(a)-(b) (West 2014) (three-year statute of repose for actual and constructive fraudulent transfers) and Me. Rev. Stat. tit. 14, § 580 (2013) (six-year statute of repose for actual fraudulent transfers).

[8] In addition to arguing the § 13-215 extends the filing deadlines of § 10(b) of the IUFTA, the Committee contends that its complaint effectively alleges an extension under the equitable doctrine of adverse domination, citing *Lease Resolution Corp. v. Larney,* 719 N.E.2d 165, 172 (Ill. App. Ct. 1999) ("[T]he adverse domination doctrine tolls the statute of limitations so long as the corporation remains under the control of the same wrongdoers against whom the cause of action exists."). Illinois courts, however, have not held that this doctrine applies to a statute of repose, and in *DeLuna,* 857 N.E.2d at 249, the Illinois Supreme Court expressly declined to decide whether equitable tolling applied to the statute of repose at issue in that case. Because fraudulent concealment serves to allow Count I to go forward regardless of the applicability of the adverse domination doctrine, it is not necessary to decide how the Illinois Supreme Court would rule on this apparently open question.

plaint sets out sufficient allegations of fraudulent concealment. The complaint alleges
that the 2007–08 equity distributions rendered SGK insolvent. Am. Compl. ¶ 54. This
created a fiduciary duty in favor of its creditors. *See Workforce Solutions v. Urban Serv.
of Am., Inc.*, 977 N.E.2d 267, 284 (Ill. App. Ct. 2012) ("[F]rom the moment insolvency
arises, the corporation's assets are deemed to be held in trust for the benefit of its credi-
tors."). In a fiduciary context, fraudulent concealment is shown either by "affirmative
acts by the fiduciary designed to prevent the discovery of the action," *Hagney v. Lope-
man,* 590 N.E.2d 466, 468 (Ill. 1992), or by a failure of the fiduciary "to fulfill his duty to
disclose material facts concerning the existence of a cause of action . . . even without af-
firmative acts or representations." *DeLuna*, 857 N.E.2d at 246. The complaint's overall
assertions on fraudulent concealment are (1) that SGK did not disclose any financial in-
formation to its creditors, (2) that the equity distributions put SGK in severe financial dis-
tress, giving rise to fraudulent transfer actions, and (3) that individual defendants used
small cash infusions to allow SGK to delay bankruptcy—and the concomitant discovery
of the distributions—until after the statute of repose would bar fraudulent transfer actions.
Am. Compl. ¶¶ 178–81. The complaint supports these conclusions with a number of de-
tailed factual allegations:

> ¶¶ 60-61 (in December 2008, after the equity distributions, SGK held a confer-
> ence call discussing its liquidity crisis);

> ¶ 68 (shareholders were instructed to destroy a letter documenting an equity offer-
> ing);

> ¶ 75 (the first NewKey loan is made);

> ¶ 94 (the NewKey loan documents lack attributes of traditional loan documents);

> ¶¶ 105-06 (by year-end 2009, SGK unsuccessfully contacts "over 70 financial
> firms" seeking capital);

> ¶¶ 110-11 (SGK insiders influence NewKey I to distribute funds to NewKey I
> members, enabling those members to infuse additional capital into SGK);

> ¶ 116 (NewKey I alters loan terms to benefit SGK for no consideration);

> ¶ 119 (the NewKey II loan is executed contemporaneously with a forbearance
> agreement with SGK's secured creditors);

¶¶ 344–45 (the Fiduciary Defendants disguised transactions so that SGK's financial records did not accurately reflect its viability); and

¶¶ 150-53 (certain defendants cause SGK to delay bankruptcy while taking actions to improve the position of NewKey I and NewKey II vis-à-vis unsecured creditors).

The defendants argue that these allegations are not sufficient, relying on *Putzier*, 2014 WL 2928236 at *9. That decision, however, does not support the defendants' argument. *Putzier* dealt with an assertion of fraudulent concealment based only on allegations of underlying fraud in the offering of franchise agreements, not the defendant's nondisclosure of that fraud: "Plaintiffs fail to allege any affirmative acts by [the defendant] that were calculated to conceal the cause of action" and "instead only allude to [the defendant's] persistent silence." *Id*. Unlike the complaint here, the *Putzier* complaint involved neither an allegation of fiduciary duty arising from insolvency nor specific actions to conceal the underlying cause of action. The present complaint adequately alleges fraudulent concealment, and Count I is not subject to dismissal on timeliness grounds.[9]

Finally, only certain of the individual defendants are alleged to be responsible for the affirmative acts of concealment, and the general rule is that a fraudulent concealment by one person will not extend the filing deadline as to another. *Chicago Park Dist. v. Kenroy, Inc.*, 402 N.E.2d 181, 185 (Ill. 1980). That rule, however, is subject to an exception: if a defendant who was not active in fraudulent concealment was in privity with an active party and knows of that party's action, the defendant will be subject to the fraudulent concealment extension. *Id*. The complaint here alleges that each of the individual defendants was a direct or indirect equity holder of SGK, that the actions taken by SGK's management were for their benefit, and that they knew of these actions by the receipt of the equity distributions and notices sent by management regarding its responses to the

---

[9] Although the complaint does not identify a specific creditor who was misled by the fraudulent concealment, this omission does not require dismissal. The Seventh Circuit allows courts to take judicial notice of claims filed in the bankruptcy in order to identify a triggering creditor under 11 U.S.C. § 544. *In re Leonard*, 125 F.3d 543, 545 (7th Cir. 1997) (noting that the trustee was not required to identify "the specific creditor who could set aside [the transfer under Illinois law]"); *In re Image Worldwide*, 139 F.3d 574, 577 (7th Cir. 1998) ("The trustee need not identify the creditor, so long as the unsecured creditor exists."). Based on the allegations of the complaint and the claims filed against the debtor, a reasonable inference can be made that a longstanding creditor exists who was prevented from exercising its rights due to the fraudulent concealment scheme. Therefore, although evidence would be required at trial to support this inference, the count survives the defendants' motion to dismiss under Rule 12(b)(6).

resulting financial distress.  Am. Compl. ¶¶ 13–44 (identification of individual defen-
dants and their interests in SGK); ¶¶ 49, 53 (issuance of equity distributions); ¶¶ 60–61,
68 (notices to all SGK members of the need for equity contributions and the NewKey
loan substitution for those contributions, with advice to destroy earlier correspondence).
These allegations are sufficient to assert the privity and knowledge necessary for all of
the individual defendants to be subject to extension of the filing deadline.

The defendants' argument for the untimeliness of Count XI fails for the same rea-
sons.  This count alleges improper distributions under § 25-35(a-b) of the Illinois LLC
Act, 805 Ill. Comp. Stat. 180/1-1 *et seq* (West 2014).  These provisions establish a cause
of action against those who receive distributions from an LLC that is in a situation of fi-
nancial distress, as defined in § 25-30 of the Act.  Count XI alleges that the 2007–08 eq-
uity distributions violated § 25-30.  Just as with the IUFTA, the existence of the chal-
lenged equity distributions is adequately alleged to have been fraudulently concealed, and
so the two-year period of repose set out in § 25-36(d) of the Illinois LLC Act is extended
by 735 ILCS 5/13-215.

The final count that the defendants challenge as untimely, Count XII, makes an-
other claim under § 25-35(a-b) of the Illinois LLC Act, asserting that because the
NewKey loans should be recharacterized as equity contributions, the interest payments on
those loans were actually equity distributions, and that, as such, the interest payments
were improperly made under § 25-30 of the Act, in part because of SGK's condition of
financial distress.  As with the 2007–08 equity distributions, the complaint adequately
alleges that the financial condition of SGK was fraudulently concealed.  The filing dead-
line for this count is also extended.

### Failure to State a Claim

The defendants' final ground for dismissal, applicable to each count of the com-
plaint, is failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  Under Rule 12(b)(6),
made applicable in bankruptcy cases by Fed R. Bankr. P. 7012(b), a complaint must pro-
vide "fair notice" of each claim, and present facts that plausibly suggest the plaintiff's
right to the relief requested.  *E.E.O.C.. v. Concerntra Health Servs.*, 496 F.3d 773, 776
(7th Cir. 2007); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In general, a
claim is plausible if the right to relief is more than speculative.  *Twombly*, 550 U.S. at 555.
A court evaluating a motion to dismiss under Rule 12(b) must accept all the factual alle-
gations in the complaint as true, *Twombly*, 550 U.S. at 571, but legal conclusions have no
weight, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Therefore, the court considering a
12(b)(6) motion should first identify pleadings that are legal conclusions and "not entitled
to the assumption of truth" and then turn to the factual allegations to see if the claim for

relief is plausible. *Id*. at 680. In doing so, the court must make all reasonable inferences in favor of the plaintiff. *Id*.

Each count of the complaint will be examined under these standards. The relief sought by the varying counts applies to particular groups of defendants, identified in the introductory paragraph of the complaint: *Fiduciary Defendants*, those alleged to be the management of SGK and NewKey; *Shareholder Defendants*, those alleged to have had ownership interests in SGK and to have received the 2008–09 equity distributions; and *Scheduled NewKey Interest Payment Recipients*, those alleged to have received interest payments on the NewKey loans.

*Count I*

Count I seeks to avoid as constructively fraudulent, under § 544(b)(1) of the Bankruptcy Code, the equity distributions that SGK made to the Shareholder Defendants in 2007 and 2008. Under § 544(b)(1), a debtor in possession—or, in this case, a creditors' committee with derivative standing—may avoid transfers that would be voidable by a creditor under state law. Illinois law, specifically the IUFTA, allows creditors to avoid transfers made by a debtor without receiving reasonably equivalent value in exchange if (a) the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or (b) the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 Ill. Comp. Stat. Ann. 160/5(a)(2) (West 2014). To state a claim under this provision, Count I must allege both that SGK did not receive reasonably equivalent value for the equity distributions and that the circumstances surrounding the distributions left SGK undercapitalized or insolvent. The defendants argue that Count I fails to allege sufficient allegations to satisfy either of these requirements.

As to both the 2007 and 2008 distributions, the defendants contend that the complaint fails to allege that SGK was insolvent or inadequately capitalized as a result of the distributions. More specifically, the debtors argue that by relying on book values to show SGK's insolvency or weak financial position, the complaint has not offered a plausible allegation of financial distress. This is incorrect for two reasons. First, the complaint does not rely exclusively on book values in alleging the financial distress resulting from the distributions. The complaint also includes:

¶¶ 60-61 (alleging that SGK's distributions were promptly followed by a liquidity crisis);

¶¶ 45, 78-79 (alleging a history of net losses);

¶ 118 (alleging entry into a loan forbearance agreement); and

¶¶ 57, 105, 115 (alleging SGK's continuing need for additional capital).

These facts set out a plausible claim of insolvency and financial distress. Second, although several decisions have held—after trial—that book values were not shown to be good evidence of the fair market value of a company's assets, the defendants cite no authority for the proposition that book values cannot support an allegation of insolvency in a particular case. To the contrary, one of the decisions cited by the defendants, *Lawson v. Ford Motor Co. (In re Roblin Indus. Inc.)*, 78 F.3d 30, 36 (2d Cir. 1996), points out that in a given case, book value may be significant:

> [W]hile book values alone may be inappropriate as a direct measure of the fair value of property . . . such figures are, in some circumstances, competent evidence from which inferences about a debtor's insolvency may be drawn. *See Schlant v. Schueler (In re Buffalo Auto Glass)*, 187 B.R. 451, 453 (Bankr.W.D.N.Y.1995) (finding debtor insolvent based on negative retained earnings reported on tax return in absence of any other evidence); *Coated Sales*, 144 B.R. at 666–67 (using unaudited preliminary balance sheet as evidence of insolvency with respect to preference payment made several months after date of statement).

A book-value indication of insolvency, combined with the allegations discussed above, is enough to support the inference that SGK was rendered undercapitalized or insolvent, as described by 740 ILCS 160/5(a)(2), by the equity distributions.[10]

For the 2008 equity distribution only, the defendants argue that the complaint fails to allege a lack of reasonably equivalent value in exchange. This argument is based on the contention that SGK was contractually obligated to distribute to its members sufficient funds to allow them to pay the tax liability resulting from SGK's 2007 income, so that the payment of the 2008 distribution, based on members' tax liability, simply satisfied SGK's contractual obligation, and so provided equivalent value. This theory was

---

[10] The defendants make additional arguments regarding accounting methods that do not change this conclusion. It may be true, as they argue, that First-In, First-Out (FIFO) accounting would produce a more accurate understanding of SGK's financial position than Last-In, First-Out (LIFO) accounting, but this is a factual matter. *See Vulcan Golf, LLC v. Google, Inc.*, 552 F.Supp. 2d 752, 764 9 (N.D. Ill. 2008) (noting that factual disputes are "wholly inappropriate at the motion to dismiss stage.").

accepted in *Crumpton v. Stephens (In re Northlake Foods), Inc.*, 483 B.R. 247, 253 (M.D. Fla. 2012) and *Gold v. United States (In re Kenrob Info. Tech. Solutions, Inc.)*, 474 B.R. 799, 802 (Bankr. E.D. Va. 2012), but it is not well grounded. Like an S-corporation, SGK had no income tax liability of its own; its members were required to treat their share of SGK's income as a personal tax liability. Assuming that SGK had committed to pay its members enough cash to satisfy their tax liability for a given year, this arrangement—even if called a contract—was equivalent to a corporate dividend; fulfilling the commitment would not produce any benefit to SGK. *See Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011) ("It was improper for the Debtors to issue the Tax Dividends and essentially pay Defendants' personal tax obligations. There is no shown consideration provided to the Debtors for these payments."). But even if complying with a commitment to pay its members' personal tax liability could generate value for SGK, there was no such commitment. The SGK Operating Agreement, Am. Compl, Ex. 8 at 15, § 7.6(c), makes any tax distribution completely discretionary with SGK's management. SGK received no consideration for the 2008 distribution.

Count I, then, states a claim for avoidance under § 544(b)(1).

*Count II*

Like Count I, Count II seeks to avoid the equity distributions that SGK made to the Shareholder Defendants in 2007 and 2008, relying on § 544(b)(1) of the Bankruptcy Code, which allows the Committee to invoke the IUFTA. Count II alleges actual fraud under § 5(a)(1) of the IUFTA, 740 ILCS 160/5(a)(1).

Since this count is raised under an actual fraud theory, the particularity requirement of Fed. R. Civ. P. 9(b) applies: "[A] party must state with particularity the circumstances constituting fraud or mistake." This requirement may be met by providing the "'who, what, when, and where' of the alleged fraud." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992).

The Amended Complaint lists the amount each defendant allegedly received in the 2007 Special Distribution and the 2008 Special Distribution and lists the dates of the distributions. Amend. Compl. ¶¶ 48, 49, 53. The Amended Complaint alleges several badges of fraud, including that the distributions were made to insiders, were made for little consideration, left SGK undercapitalized, and were hidden by a fraudulent concealment scheme. This meets the requirements of Rule 9(b).

The defendants argue that the allegations in the Amended Complaint do not adequately identify which defendants committed the alleged fraud, citing *Vicom, Inc. v. Har-*

*bridge Merch. Serv., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). A policy against "lumping" defendants ensures that defendants each have proper notice of the claims against them. *See Vicom*, 20 F.3d at 778 (for proper notice, when alleging fraud "in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" (citations omitted)).

The Amended Complaint, however, does identify the "Fiduciary Defendants"—Michael Sheffieck, Keywell Manager, J. Mark Lozier, Joel Tauber, and Michael Rosenberg—as the defendants who were responsible for the fraud. Am. Compl. ¶ 203–06. These defendants were given notice that the complaint alleges that they acted in concert to perpetrate the fraud outlined in detail in the complaint. Moreover, the Committee, as an outsider alleging fraud against insiders, cannot be expected to have detailed information regarding the fraud and may plead fraud with a less specificity than would otherwise be required. *See Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (recognizing the lower pleading standard).

Count II also states a claim for avoidance under § 544(b)(1).

*Count III*

In Count III, relying on both federal and state law, the Committee seeks recharacterization of the NewKey loans as equity.[11] The Bankruptcy Code does not specifically provide for such recharacterization, and the Seventh Circuit has not adopted the decisions of other circuits—such as *Fairchild Dornier GMBH v. Official Comm. Of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation)*, 453 F.3d 225, 233 (4th Cir. 2006)—holding that bankruptcy courts have equitable power to order recharacterization. *See In re Airadigm Commc'n, Inc.*, 616 F.3d 642, 657 n.11 (7th Cir. 2010) ("This Court has . . . never definitively stated whether we recognize a cause of action for recharacterization."). Indeed, it is unlikely that the Seventh Circuit would find that the equitable power of a bankruptcy court allows treating a creditor's claim in a manner not stated in the Code. *See In re Fesco Plastics Corp., Inc.*, 996 F.2d 152, 157 (7th Cir. 1993) (holding that that "a bankruptcy court is . . . not authorized to do whatever is necessary to reach an equitable result; it may only do whatever is necessary to enforce the Code.").

---

[11] The complaint is not required to specify which legal theory provides a basis for the relief it seeks; an allegation of facts supporting a claim for recharacterization is enough. *Cf. Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("[H]aving stated a discrimination claim the complaint need not offer specifics about which rules of law, state or federal, racial discrimination offends.").

Nevertheless, the relief sought by the trustee may be obtained under § 502(b)(1) of the Bankruptcy Code, which provides for the disallowance of claims to the extent they are "unenforceable against the debtor . . . under . . . applicable law." *See Grossman v. Lothian Oil, Inc. (In re Lothian Oil, Inc.)*, 650 F.3d 539, 544 (5th 2011) ("Because Texas law would not have recognized [a creditor's] claims as asserting a debt interest, the bankruptcy court correctly disallowed them as debt and recharacterized the claims as equity interests."); *Official Comm. Of Unsecured Creditors v. Hancock Park Capital II, LP (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1147 (9th Cir. 2013) ("[A] court may recharacterize an obligation that does not constitute 'debt' under state law . . . ."). Illinois law, like that of Texas, provides that nominal loans may be recharacterized as contributions of equity if the circumstances of their creation and enforcement indicate that they were intended as equity contributions. *See Estate of Kaplan,* 384 N.E.2d 874, 881–82 (Ill. App. Ct. 1978) (affirming recharacterization based on federal tax decisions that state "general principles . . . useful in determining the proper accounting treatment of [questioned] advances.").

One federal tax decision typical of those cited in *Kaplan*, *Raymond v. United States*, 511 F.2d 185, 187–88 (6th Cir. 1975), affirmed recharacterization of debt based on the following considerations:

> [N]o notes were ever given to evidence the obligations, and . . . the corporation gave them no unconditional promises to repay the obligations at fixed maturity dates or at fixed interest rates. The evidence also disclosed that no security was given for the advances, and that it was unlikely that an outsider would have made such speculative loans. Moreover, it appeared that the corporation was inadequately capitalized and that some of the advances were used to purchase capital assets. Finally, the proofs showed that taxpayers' advances were subordinate to the claims of outside creditors and that repayment of the advances was contingent on the success of the enterprise. . . .

> [T]he district court could properly consider all these factors in addition to the identity of interest between the creditors and the shareholders and the timing of the advances during the corporation's organization.

Not all of the factors relied on in *Raymond* are alleged in Count III. However, *Raymond* did not treat all of the factors as necessary predicates for recharacterization. To the contrary, it found the evidence so strong that it affirmed a directed verdict for recharacterization, even though the taxpayer introduced "a ledger from the corporation's books that had the notation, 'notes payable' . . . and two checks . . . that stated that they were written as loans from taxpayers." *Id.* at 187.

According to the defendants, a promissory note creates a presumption of validity of a loan under Illinois law. *See Steiner v. Rig-A-Jig Toy Co.*, 135 N.E.2d 166, 170 (Ill. App. Ct. 1956). However, that presumption is rebuttable. *Id.* Rather than treating any single factor as dispositive, recharacterization depends on the various elements bearing on the "essential identity" of the transaction in question. *Estate of Kaplan*, 384 N.E.2d 874, 881 (Ill. App. Ct. 1978). The complaint here makes a number of factual allegations indicating that the NewKey loans were essentially equity contributions: SGK's insolvency at the time of the transaction, ¶¶ 45, 60–61, 78–79; the unavailability of third-party loans, ¶ 106; the initial plan to have an equity contribution rather than a loan, ¶¶ 64–66; and waivers of the loan conditions without consideration from SGK, ¶ 116. *In re Optim Energy, LLC*, 2014 WL 924908 (Bankr. D. Del. May 13, 2014), which the defendants cite in support of dismissal, deals with a complaint that the court found failed to effectively assert any factors like these.

Count III states a claim for recharacterization under Illinois law.

*Count IV*

Count IV alleges that the interest payments made under the NewKey loan agreements were constructively fraudulent under 740 ILCS 160/5 and therefore are avoidable under § 544(b) of the Bankruptcy Code. The underlying law and the relevant allegations of the complaint are discussed above in connection with Count I, and the only additional basis for dismissal offered by the debtors is that interest payments required by a valid obligation have reasonably equivalent value to the entity paying them. *Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008). However, the complaint adequately alleges that the interest payments were made without reasonably equivalent value. As discussed above in dealing with Count III, the complaint has adequately alleged that the NewKey loans should be recharacterized as equity investments. If so, SGK would not have a debt obligation to justify the interest payments.

Count IV states a claim for avoidance under § 544(b)(1).

*Counts V and VI*

Count V also seeks to avoid the interest payments made under the NewKey loans, alleging actual fraud under § 544(b)(1) and 740 ILCS 160/5. Count VI seeks to avoid interest payments made two years before SGK filed its bankruptcy petition under 11 U.S.C. § 548.

Since Counts V and VI allege actual fraud, Rule 9(b) applies. However, as with

21

Count II, the complaint meets the heightened pleading requirements.  The complaint al-
leges that the Fiduciary Defendants disguised equity contributions as loans, enabling
SGK to make interest payments to insiders during a time when the company was either
insolvent or undercapitalized, and that the NewKey loans should be recharacterized as
equity contributions.  Under this theory, the interest payments were made for no consid-
eration.  Am. Compl. ¶ 271.  The complaint identifies who received the payments, the
dates the payments were made, and the amount of the payments.  This creates a plausible
claim for relief.

Counts V states a claim for avoidance under § 544(b)(1), and Count VI states a
claim for avoidance under § 548.

*Count VII*

Count VII seeks relief under 11 U.S.C. § 510(c) as an alternative to the recharac-
terization sought in Count III.  If the NewKey loans are not treated as equity contribu-
tions, and retain their status as claims against the estate, § 510(c) of the Bankruptcy Code
would allow them to be paid only after the payment of other creditors' claims, as long as
this result is appropriate "under principles of equitable subordination."  The principles of
equitable subordination, in turn, have been defined by the case law as requiring that three
elements be established: (1) that the party against whom subordination is sought have en-
gaged in inequitable conduct, (2) that the conduct caused harm to other parties with
claims, and (3) that the subordination does not contradict other policies of the Bankruptcy
Code.  *See United States v. Noland*, 517 U.S. 535, 538–39 (1996); *In re Kreisler*, 546
F.3d 863, 866 (7th Cir. 2008); *see also Benjamin v. Diamond (In re Mobile Steel Co.)*,
563 F.2d 692, 703 (5th Cir. 1977).

The first of these elements, inequitable conduct, is established by any conduct of a
defendant that is unfair to other claimants.  *See Fabricators, Inc. v. Technical Fabrica-
tors (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 n.14 (5th Cir. 1991) (quoting *Benja-
min v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977) and *Bostian v.
Schapiro (In re Kansas City Journal-Post Co.)*, 144 F.2d 791, 803–04 (8th Cir. 1944) for
the rule that inequity may "arise out of any unfair act on the part of the creditor, which
affects the bankruptcy results to other creditors.").  Cases dealing with the element of in-
equitable conduct have distinguished between defendants who are insiders and fiduciaries
of the debtor and those who are not.  NewKey is alleged to be controlled by the same in-
dividuals who controlled SGK, so NewKey should be held to a higher standard of con-
duct.  *See Am. Compl. ¶ 74 (NewKey officers and SGK officers nearly identical).  The
Seventh Circuit stated the rule this way:

An insider is a fiduciary of the corporation. *Pepper* [*v. Litton*], 308 U.S.
[295,] 306 [(1939)]. If her conduct breached the 'rules of fair play and
good conscience' . . . the bankruptcy court can send her back to the end of
the line . . . . Courts subject the dealings of an insider to 'rigorous scrutiny'
for any such breach. *Id.* at 306.

*In re Lifschultz Fast Freight,* 132 F.3d 339, 344 (7th Cir. 1997).

The misconduct alleged in the complaint, again, is that the defendants both en-
gaged in large fraudulent transfers of SGK's cash and then concealed the existence of
these transfers until the creditors of SGK would be time-barred from complaining of it.
The NewKey loans are alleged to be part of the concealment, keeping SGK operating de-
spite an untenable financial condition. *See* Am. Compl. ¶¶ 66, 105, 119, 149–53, 325.

The second element of equitable subordination requires a showing that the defen-
dant's inequitable conduct caused harm to other claimants and interest holders. Obvi-
ously, to the extent that the delay in discovery is effective to bar actions to recover
fraudulent transfers, there would be harm to SGK's creditors, but the complaint also al-
leges that the delay caused deterioration in the assets available to pay the creditors in
bankruptcy. Am. Compl. ¶¶ 149–53, 206–08.

Finally, in conformity with the third element, there is nothing in subordination of
the NewKey loans that would appear to be inconsistent with the policies of the Bank-
ruptcy Code, and the defendants have suggested none.

The defendants' only response to Count VII's allegations is that insider lending to
an undercapitalized entity cannot in itself subject the lenders to equitable subordination.
*Lifschultz* so holds, stating that "undercapitalization alone, without evidence of deception
about the debtor's financial condition or other misconduct, cannot justify equitable sub-
ordination of an insider's debt claim." 312 F.3d at 349. But the complaint's allegations,
as outlined above, allege just such deception.

Count VII states a claim for equitable subordination under § 510(c).

*Counts VIII and IX*

Count VIII seeks damages for breach of the fiduciary duty of care that SGK's of-
ficers and directors owed creditors once SGK neared insolvency. Count IX seeks dam-
ages for a similar breach of the duty of loyalty. In both counts, the Committee seeks pu-
nitive damages.

The defendants assert four insufficiencies in these counts: (1) that insolvency is inadequately pleaded; (2) that the Amended Complaint lacks factual allegations that Tauber owed SGK a fiduciary duty; (3) that the counts do not meet the heightened pleading standards of Rule 9(b); and (4) that the punitive damages requests are inadequately pleaded and should be stricken.  None of these matters require dismissal of the counts.

First, as discussed above in connection with the timeliness of Count I, the complaint adequately alleges SGK's insolvency at the relevant times, and this financial condition generates a fiduciary duty to creditors.  *See Workforce Solutions v. Urban Serv. of Am., Inc.*, 977 N.E.2d 267, 284 (Ill. App. Ct. 2012) (when a corporation is insolvent, the fiduciary duties owed to the corporation are shifted to creditors).  With insolvency, SGK management would be obligated to conduct its business in a manner consistent with this duty.  All of the Fiduciary Defendants, other than Tauber, have acknowledged that they owed SGK fiduciary duties because of their status as officers or directors, and so their status as fiduciaries to the creditors is adequately alleged.

Second, although Tauber is not alleged to have been an officer or director of SGK, the Illinois LLC Act provides that even non-managing members owe their LLC a fiduciary duty when exercising "managerial authority."  805 Ill. Comp. Stat. Ann. 180/15-3(g)(3) (West 2014).  The Amended Complaint alleges that Tauber was Chairman and 50% owner of Keywell Manager, the managing member of SGK.  Am. Compl. ¶ 14.  The Amended Complaint also asserts that Tauber, along with the other Fiduciary Defendants, made major decisions for SGK, including substituting a secured loan for a new stock offering.  Am. Compl. ¶¶ 55, 64.  From this, a reasonable inference may be drawn that Tauber was active in the management of SGK and exerted authority over its actions.  With these allegations, there is a sufficient basis for the conclusion that Tauber owed SGK a fiduciary duty.

Third, the defendants argue that these counts fail to meet the heightened pleading standards of Rule 9(b).  As discussed in connection with Count II, the complaint adequately identifies and gives notice to the defined "Fiduciary Defendants."  The complaint contains specific allegations of the actions that the Fiduciary Defendants took to ensure that equity holders—including themselves—gained priority over general unsecured creditors, breaching SGK's fiduciary duty to the creditors. *See* Am. Compl. ¶¶ 150–53, 341, 347.

Finally, the defendants are alleged to have acted intentionally.  The complaint alleges that the Fiduciary Defendants knew that SGK was insolvent and purposefully took actions to protect insider interests.  Am. Compl. ¶¶ 68, 349, 350, 371.  Under Illinois law, willful breach of a fiduciary duty may entitle a plaintiff to punitive damages.  *See Dowd*

*& Dowd, Ltd*. *v*. *Gleason*, 816 N.E.2d 754, 773 (Ill. App. Ct. 2004) (citing *Citicorp Savings v*. *Rucker*, 692 N.E.2d 1319, 1326 (Ill. App. Ct. 1998)).  The complaint adequately alleges such an entitlement.

Counts VIII and IX state claims for breach of fiduciary duty and for the relief sought.

*Count X*

Count X seeks to avoid a security interest and a loan repayment made to Lozier, asserting that they were preferences under 11 U.S.C. § 547(b).  A cause of action under § 547(b) requires several allegations with respect to a transfer from the debtor:

(1) that a transfer was made to a creditor
(2) on account of an antecedent debt owed before the transfer was made
(3) while the debtor was insolvent,
(4) within one year of the bankruptcy filing if the creditor was an insider,
(5) resulting in the creditor receiving more on account of the debt than the creditor would have received from a claim made in a Chapter 7 bankruptcy case.

 11 U.S.C. § 547(b) (2012).  The complaint makes each of these required allegations.  It specifies two transfers from SGK, (a) of a security interest in its assets, ¶ 382, and (b) of a payment $1,015,333.33, ¶ 383, and alleges:

(1) that the transfers were made to Lozier, who was a creditor as a result of a $1 million loan he made to SGK on January 7, 2013, ¶ 380;
(2) that loan was outstanding before the security interest was granted (after January 9, 2013) and the payment was made (on February 6, 2013) and that the transfers were made on account of that loan, ¶¶ 382-83, 391;
(3) that SGK was insolvent at the time of the transfer, ¶ 392;
(4) that Lozier was an insider of SGK, ¶ 389, and that the transfers were made within one year of SGK's bankruptcy filing, ¶ 390; and
(5) that the transfers resulted in Lozier receiving a greater payment on his loan than he would have received if he had filed a claim on the loan in a Chapter 7 bankruptcy case, ¶ 387.

The defendants argue that, under 11 U.S.C. § 547(e)(2), the transfer of the security interest occurred contemporaneously with the loan of $1 million since the security agreement was made "effective as of January 7, 2013" and perfected within thirty days. This argument misreads the complaint: it does not allege that Lozier received a prefer-

25

ence because of the perfection of his security interest but because of the granting of that interest. The complaint alleges that Lozier did not receive a security interest on January 7, 2013 when he loaned the $1 million to SGK but at least two days later. *Cf. Nat'l City Bank of New York v. Hotchkiss*, 231 U.S. 50, 58 (1913) (finding preferential the grant of a security interest even though it was made on the same day as an antecedent loan, where the loan was originally unsecured).

Lozier is correct in arguing that, if his security interest was granted in a "substantially contemporaneous exchange," the transfer would not be avoidable. *See* 11 U.S.C. 547(c)(1)(B). Similarly, if the transfers were made in the ordinary course of business, they would not be avoidable. 11 U.S.C. § 547(c)(2). However, these are affirmative defenses that Lozier has the burden of asserting—and proving—under § 547(g). A complaint is not required to deny the availability of affirmative defenses. *Cf. Jones v. Bock,* 549 U.S. 199, 216 (2007) (holding because failure to exhaust state remedies is an affirmative defense in certain prisoner litigation, "inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Count X states a claim for avoidance of preferential transfers under § 547(b).

*Counts XI and XII*

As discussed above in connection with the timeliness of the complaint, Counts XI and XII seek damages for violation of § 25-35(a-b) of the Illinois Limited Liability Act, 805 Ill. Comp. Stat. Ann. 180/25-35(a-b) (West 2014), which establishes a cause of action against those who receive distributions from an LLC that is in a situation of financial distress, as defined in § 25-30 of the Act. Count XI alleges that the 2007-08 equity distributions violated § 25-30. Count XII alleges a similar violation by the interest payments made on the NewKey loans, stating that because these loans should be recharacterized as equity contributions, the interest payments were improper equity distributions.

The complaint adequately alleges SGK's financial distress at the time of the challenged payments and that the NewKey loans should be recharacterized. *See supra* Count III. The defendants, however, assert an additional ground for dismissal of the Counts XI and XII, based on the limitation of § 25-35(a-b) to a defendant who either "votes for or assents to a distribution made in violation of Section 25-30" or who "knew a distribution was made in violation of Section 25-30." There is no allegation in Counts XI and XII that the defendants named in those counts voted for or assented to the distributions, and the defendants assert that the counts inadequately allege knowledge that the distributions violated the Act.

However, Count XI contains an allegation that the defendants "received and had access to [SGK's] financial information," which could have given them knowledge that the equity distributions would render SGK insolvent in violation of § 25-30. Count XII, on the other hand, alleges, without any factual detail, only that the defendants named in that count "knew that the NewKey loans were not true loans and actually vehicles to pay out Keywell insiders [and] therefore knew the NewKey Interest Payments were actually distributions made in violation of 805 ILCS 180/25-30." Am. Compl. ¶ 425. This allegation is based on the assumption the defendants would have had a sufficient understanding of fraudulent transfer law to conclude that the NewKey loans would be recharacterized as equity contributions so that interest payments on these loans would actually be equity distributions. That assumption is not plausible, and so Count XII fails to allege an essential element for recovery.

Count XI states a claim for recovery under 805 ILCS 180/25-35(a-b); Count XII fails to do so, and will be dismissed.

*Counts XIII and XIV*

Counts XIII and XIV allege that the Keywell Manager breached the operating agreements (the Keywell [SGK] Operating Agreement and Amended Keywell [SGK] Operating Agreement) by allowing distributions that threatened SGK's ability to be an operating business.

The defendants argue that only members of SGK may bring a breach of contract claim under the operating agreements. *See Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001) (noting that, under Illinois law, actions under a contract may "be brought only by a party to that contract, by someone in privity with such a party, or by an intended third-party beneficiary." (citations omitted)). Since it was not a party to the operating agreements, the only way that SGK—derivatively through the Committee—can bring a claim under the operating agreements is if it were a third-party beneficiary.

Under Illinois law, the parties to a contract must have manifested an "intention to confer a benefit upon" an asserted third-party beneficiary. *See Federalphia Steel LLC Creditors' Trust v. Fed. Pipe & Steel Corp.*, 368 B.R. 679, 694 (N.D. Ill. 2006). The designation as a benefited party "must affirmatively appear from the language of the instrument when properly interpreted and construed." *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498, 501 (Ill. 1931). The *Federalphia* court found beneficiary status conferred by a clause that gave the third party a right to seek relief under the contract. 368 B.R. at 694. No such provision appears in the SGK operating agreement; at most, the agreements state that SGK will be an operating company, not that SGK has any right of enforcement. *See*

Am. Compl. Ex. 8 at §§ 7.6(a), 7.6(c).

Counts XIII and XIV fail to allege an essential element for their claimed breach of contract and will be dismissed.

*Counts XV and XVI*

Counts XV and XVI challenge the security interests claimed by NewKey in various collateral.

Count XV deals with security interests claimed in the debtor's cash on hand as of the petition date; it alleges that NewKey cannot have a perfected security interest in this cash because, under Illinois Uniform Commercial Code, a security interest in cash may only be perfected by possession, *see* 810 Ill. Comp. Stat. Ann. 5/9-312(b)(3) (West 2014), and New Key did not have possession of SGK's cash. Am. Compl. ¶ 454. The defendants contend that this allegation is insufficient because the cash on hand would have been the proceeds of other collateral in which they had a perfected interest. Although that contention would be a basis for denying the allegation of ¶ 454, it does not make the allegation insufficient. The status of cash as proceeds of collateral is required to be established by the secured creditor under 810 Ill. Comp. Stat. Ann. 5/9-315(b)(2) (West 2014), which requires tracing of the cash to the other collateral. *See Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439–40 (7th Cir. 2005) (discussing tracing under the predecessor to § 9-312(b)(3)). The defendants' argument here establishes only a possible evidentiary dispute, not a ground for dismissing Count XV.

Count XVI deals with security interests claimed in SGK's deposit accounts, including accounts for rent, utilities, legal services, and insurance policies. It alleges, at ¶ 458, that NewKey cannot have perfected security interests in the deposit accounts because they lack deposit control agreements, as required by Illinois law. 810 Ill. Comp. Stat. Ann. 5/9-104(a)(2) (West 2014); 810 Ill. Comp. Stat. Ann. 5/9-312(b)(1) (West 2014). However, this requirement applies only to "deposit accounts" as defined in § 9-102(29) of the Uniform Commercial Code, and that definition is limited to accounts "maintained with a bank." Count XVI is therefore subject to dismissal, since its allegation does not support the relief sought. However, if the complaint were amended to treat the deposits in the same way as cash is treated in Count XV, the same issue of tracing would be presented.

Count XV states a claim for a declaration that the security interest claimed in SGK's cash on hand is not perfected. Count XVI fails to state a claim for such a declaration as to SGK's non-bank deposit accounts and will be dismissed.

*Counts XVII, XVIII, and XIX*

The final three counts of the complaint seek declarations of invalidity as to security interests in SGK assets other than the cash and deposit accounts treated in Counts XV and XVI, specifically, rail cars (Count XVII), a membership interest in a Cayman Islands insurance company (Count XVIII), and otherwise unencumbered real property (Count XIX).  The defendants claim that, since they are no longer asserting these security interests, the counts should be dismissed as moot.  However, the defendants do not contend that there was not a basis for the allegations as the time the complaint was filed.  These counts do state a claim for the relief sought, and the defendants' agreement to that relief is better set forth in an answer admitting the allegations rather than in a motion to dismiss.

**Conclusion**

For the reasons set out above, an order will be entered together with this decision, granting the Committee's standing motion, dismissing Counts XII, XIII, XIV, and XVI of the Amended Complaint, and otherwise denying the defendants' motion to dismiss.

Dated:  November 6, 2014

_____
Eugene R. Wedoff
United States Bankruptcy Judge