# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 13 B 37603** |
| **SGK VENTURES, LLC,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **KELLY BEAUDIN STAPLETON, solely** | ) | |
| **in her capacity as Trustee of the SGK** | ) | |
| **Ventures, LLC Liquidating Trust,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary No. 13 A 01411** |
| | ) | |
| **NEWKEY GROUP, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **NEWKEY GROUP, LLC, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adversary No. 14 A 00114** |
| | ) | |
| **SGK VENTURES, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## Memorandum of Decision

These adversary proceedings are before the court for judgment after trial.
The proceedings deal with the effect of decisions made by the management of the

debtor, an Illinois limited liability company, before it filed the pending Chapter 11 case.

The first proceeding was brought on behalf of the debtor. The complaint seeks relief from the debtor's members and from two entities formed to lend funds to the debtor. The major relief sought from debtor's members—under fraudulent conveyance law—is the recovery of funds that the debtor transferred to them in 2007 and 2008. A separate fraudulent conveyance claim seeks to avoid a security interest that the debtor granted in connection with a member's 2013 loan, which would make repayment of that loan preferential. The complaint also alleges that various individuals and entities breached statutory or common-law duties to the debtor or its unsecured creditors.

From the lending entities and their members, the major relief sought involves loans that the entities made to the debtor in 2008 and 2011, either recharacterizing the loans as equity contributions or subordinating them to the claims of the unsecured creditors. The sufficiency of the complaint's allegations is the subject of an earlier decision, *Official Comm. of Unsecured Creditors v. NewKey Group, LLC (In re SGK Ventures, LLC)*, 521 B.R. 842 (Bankr. N.D. Ill. 2014) ("*SGK Ventures*").

The second proceeding, brought by the two lending entities, is a mirror image of portions of the first. It seeks recognition of the validity of the entities' loans and immediate satisfaction of the liens supporting them from the proceeds of the debtor's estate.

As discussed below, the evidence at trial established that the debtor is entitled to equitable subordination of the lending entities' loans. A right to all of the other requested relief was not proven. Because the transfers of the lending entities are subordinated, they are not entitled to enforcement of their rights as secured creditors until the claims of all other creditors are paid in full, precluding the relief sought in their complaint.

## Jurisdiction

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code (Title 11, U.S.C.). The district courts may refer these cases to the bankruptcy judges for their districts under 28 U.S.C. § 157(a), and the District Court for the Northern District of

Illinois has made such a reference through its Internal Operating Procedure 15(a).

After a case is referred to a bankruptcy judge, the judge is authorized by 28 U.S.C. § 157(b)(1) to hear and determine "core proceedings" arising under the Bankruptcy Code, and § 157(b)(2) gives several examples of core proceedings. For other, "non-core" proceedings, § 157(c)(1) provides that the bankruptcy judge should not enter judgment, but rather submit proposed findings of fact and conclusions of law to the district court for its issuance of judgment. These statutory provisions are not completely consonant with constitutional limits on a bankruptcy judge's authority. Under Article III of the Constitution, a bankruptcy judge, lacking the life-tenure and protected compensation that Article III requires for federal judges, may only enter final judgment on matters of "public right," even though the statute includes as core proceedings some matters of "non-public right." *Stern v. Marshall,* 131 S.Ct. 2594, 2611-12 (2011).

The present adversary proceedings involve matters that may not be subject to final adjudication by a bankruptcy judge under the *Stern* decision. However, all of the parties have expressly consented to such final adjudication, and that consent allows entry of judgment by a bankruptcy judge. *Wellness Int'l Network, Ltd. v. Sharif,* 135 S.Ct. 1932, 1942–45 (2015).

## Findings of Fact

### A. Parties and Lending Bank

1. *Debtor/defendant in the second proceeding*

SGK Ventures, LLC, the debtor, is an Illinois limited liability company, owned by its members. Before filing for bankruptcy, the debtor was named Keywell, LLC, and because all of the events relevant to these proceedings took place before the debtor's bankruptcy filing, "Keywell" is the name used in this opinion.

Keywell was organized as a manager-managed LLC, under which a manager, rather than the members, controls the entity's business. DX 17-0011 at 16, § 8.1(a) (Keywell Operating Agreement); see 805 ILCS 180/15-1(b)(2).[1]  Keywell

---

[1] The following abbreviations are used for citations to the record: trial transcripts, trial date and page (e.g., 5/11 Tr. __); exhibits of the plaintiff trustee, PX __; exhibits of the defendants, DX __.  Page numbers are those of the docu-

chose to be treated as a partnership for income tax purposes, and so liability for income taxes was borne not by Keywell itself, but by its members, in proportion to their ownership interests. 5/11 Trial Tr. at 324:5-24; see IRS Pub. 3402 (election of tax treatment by LLCs). Keywell is the defendant in the second adversary proceeding, brought by two entities that entered into loan agreements with Keywell before its bankruptcy filing.

### 2. *Plaintiff*

Keywell's complaint—in the first adversary proceeding— is being prosecuted by Kelly Stapleton, trustee of a liquidating trust created by Keywell's Chapter 11 plan. *See* Bankr. Docket No. 747, 853 (modified plan and confirmation order). The complaint was initially filed by the Official Committee of Unsecured Creditors, which was granted derivative standing to pursue the action. *See SGK Ventures*, 521 B.R. at 847-54. Because the rights of the bankruptcy estate passed to the liquidating trust under the plan, the liquidating trustee was substituted as plaintiff. Throughout this opinion, the plaintiff is referred to as "the trustee".

### 3. *Defendants: Keywell members*

Among the defendants in the trustee's complaint are members of Keywell, alleged to have received avoidable cash distributions from Keywell.

### 4. *Defendants: Keywell Manager*

KCL Management Corporation ("Keywell Manager")—an Illinois corporation—was the manager of Keywell and responsible for making its executive and strategic decisions. *See* Ans. to Amend. Compl. ¶12, Trustee Adv. Docket Nos. 152, 162. Among these decisions was whether and to what extent Keywell should make cash distributions to its members, including distributions to assist members in paying the income taxes resulting from their ownership interests. DX 17-0011 at 15, § 7.6(a), (c). The complaint seeks damages from Keywell Manager for an alleged breach of its fiduciary duties to Keywell and to Keywell's creditors.

### 5. *Defendants: The Keywell Manager board*

Keywell Manager, in turn, was controlled by its board, and so its board members effectively controlled Keywell. Keywell Manager's board had three members:

---

ment as reproduced in Portable Document Format (pdf), rather than by internal pagination.

- J. Mark Lozier, who owned 50% of Keywell Manager's equity, served as the CEO and secretary of Keywell Manager. 5/15 Tr. 222. Lozier also served as the president of Keywell itself from 1996 until its sale in bankruptcy. 5/18 Tr. 6.

- Joel D. Tauber, who owned the other 50% of Keywell Manager, served as chairman of the Keywell Manager board. 5/11 Tr. 49. Although Tauber had been involved in the scrap metal industry since the 1970's, he never had an operational role with Keywell. 5/11 Tr. 52.

- Michael Rosenberg owned no equity in Keywell Manager but served on its board since the mid-1990's. 5/11 Tr. 146. At Keywell, he was a senior vice president, primarily responsible for buying inventory. *Id.*

The Keywell Manager board met once a quarter, though the board members regularly communicated about the business between meetings. 5/11 Tr. 147–48. The Keywell Manager board meetings generally consisted of two parts: the board would first hear presentations from Keywell's executive committee—the officers and key managers of the company—and then there would be private discussions among the three board members. 5/11 Tr. 150–51, 155. Presentations to the board were compiled in packages distributed to board members before the meeting. 5/11 Tr. 153; DX 01-0135 (example of a board package).

The testimony and documentation produced at the trial established that Lozier and Tauber were the principal decision makers for Keywell. Although Rosenberg participated in meetings of the Keywell Manager board and had private discussions with Lozier on Keywell matters—see, e.g., Lozier's testimony at 5/18 Tr. 8:20-10:7—there is no documentation indicating that Rosenberg actively participated in any of the relevant decisions and Rosenberg's own testimony reflected a lack of familiarity with much of the decision-making. 5/11 Tr. 248-49, 252-53, 258-62.

Lozier and Tauber also had the largest ownership positions in Keywell itself. A family LLC solely controlled by Lozier held more than a 46% ownership interest in Keywell. 5/15 Tr. 222-23; DX 10-0012. A family trust and family LLCs controlled by Tauber had more than 24% ownership. 5/11 Tr. 58-60; DX 10-0012.

The trustee's complaint seeks damages against all three of the board members for breaches of their fiduciary duties to Keywell and to Keywell's creditors.

### 6. *Defendants: Other Keywell personnel*

In addition to Lozier, Tauber, and Rosenberg, members of Keywell's executive committee included Michael Sheffieck, Keywell's chief financial officer and treasurer, who contributed financial reports and analyses to the board packages. 5/11 Trial Tr. 86, 156. Sheffieck also had a significant (5%) ownership interest in Keywell, through a family limited partnership and a trust. 5/11 Tr. 301-05; DX 10-0012. Sheffieck's testimony and the documentation introduced into evidence establish that he was experienced and knowledgeable in accounting and financial matters and that he was significantly involved in the Keywell decisions at issue.

Other key employees included Louis Wagner, Keywell's general counsel, and Karen Beninato, Keywell's controller and assistant treasurer. 5/11 Tr. 86. The trustee is seeking damages from Sheffieck for breach of fiduciary duty and as a recipient of Keywell payments as a member of Keywell and the NewKey entities. The trustee is seeking damages against Beninato as a Keywell and NewKey member and from from Wagner as a NewKey member.

### 7. *Defendants/plaintiffs in the second proceeding: The NewKey entities*

In 2009, NewKey Group, LLC ("NewKey I") was created for the purpose of providing funding for Keywell. In 2011, NewKey Group II, LLC was created for the same purpose. 5/11 Tr. 87-88, 106. The trustee seeks either to recharacterize the NewKey loans as equity contributions or to equitably subordinate them.

The NewKey entities seek a finding that their liens are valid and their claims against the estate should be paid immediately, prior to those of unsecured creditors.

### 8. *LaSalle Bank and Bank of America*

LaSalle Bank was Keywell's primary lender from 1999 until it was acquired by Bank of America ("BofA"), which took over the lending relationship. 5/13 Tr. 211.[2]

---

[2] Originally, credit was extended to Keywell through a syndicate that included BMO Harris and the Royal Bank of Scotland. *See* 5/12 Tr. 165. But in mid-2012, BofA, as LaSalle's successor, purchased the positions of the other two members of the syndicate. PX 139 at 4.

## B. Background

### 1. *General business*

During the time most relevant to this proceeding, 2006-13, Keywell's primary business was as an intermediate entity in metal recycling. It bought scrap metal from a "network of more than 1,000 scrap yards, industrial plants, governmental agencies, and large mills located in North America," sorted and processed the scrap, and sold the processed scrap "to aerospace metals and specialty steel producers." DX 0216 at 4, 9; 5/11 Tr. 50. Keywell had three primary business lines: recycled stainless steel, recycled titanium, and high-temperature alloys. In 2007, it estimated that it had a third of the North American market for these products. DX 01-0080 at 5–6.

### 2. *Stainless steel*

The bulk of Keywell's business was in stainless steel; Keywell estimated that more than three quarters of its 2007 sales came from this business line. *Id.* at 5; 5/13 Tr. 43. In contrast to the large number of its suppliers, Keywell's stainless steel customers were highly concentrated, with just five customers generating as much as 90% of its business and with one customer, AK Steel, generating over half. 5/15 Tr. at 227-28.  The profitability of Keywell's stainless steel business was affected by two variables: the price of stainless steel—reflected in the price of nickel—and the volume of its stainless steel sales.

   a. *Nickel price.* Nickel was the "primary value component" of Keywell's stainless steel scrap, and changes in the price of nickel correlate closely with the price of that scrap. 5/13 Tr. 46; 5/15 Tr. 226; DX 13-0001 at 9.[3] This close correlation is reflected in data published in a USGS report, Metal Prices in the United States through 2010: U.S. Geological Survey Scientific Investigations Report 2012–5188 (available at http://pubs.usgs.gov/sir/2012/5188/sir2012-5188.pdf). The report lists average annual prices for both nickel (in dollars per pound) and stainless steel scrap (in dollars per long ton), from 1987 to 2010. *Id.* at 112-113. Dividing the scrap prices by 2,240 (the number of pounds in a long

---

[3] One reason for the close relationship is that stainless steel is the predominant use of nickel. Nickel is a component of stainless steel (8-10% of the usual grades) and stainless steel accounts for 65% of annual consumption of nickel in North America. 5/13 Tr. 44; DX 02-0216 at 14. So changes in demand for stainless steel result in changes in the price of both stainless steel and nickel. See DX 01-0001 at 54, attributing an increase in nickel prices to an increased demand for stainless steel.

ton) allows a per pound comparison of the historical prices of the two commodities, with the average annual price for nickel consistently about 10 times the price for stainless steel scrap, as shown in the following chart and graph.[4]

---

[4] A similar graph is set out in DX 02-0215 at 18.

|      | Stainless Steel Scrap x 10 | Nickel  |
|------|---------------------------|---------|
| 1987 | $ 2.50                    | $ 2.19  |
| 1988 | 5.13                      | 6.25    |
| 1989 | 5.65                      | 6.04    |
| 1990 | 4.14                      | 4.02    |
| 1991 | 3.82                      | 3.70    |
| 1992 | 3.25                      | 3.18    |
| 1993 | 2.83                      | 2.40    |
| 1994 | 3.17                      | 2.88    |
| 1995 | 4.71                      | 3.73    |
| 1996 | 3.72                      | 3.40    |
| 1997 | 3.61                      | 3.14    |

|      |       |       |
|------|-------|-------|
| 1998 | 2.68  | 2.10  |
| 1999 | 2.79  | 2.73  |
| 2000 | 3.68  | 3.92  |
| 2001 | 2.83  | 2.70  |
| 2002 | 3.14  | 3.07  |
| 2003 | 4.21  | 4.37  |
| 2004 | 6.58  | 6.27  |
| 2005 | 6.55  | 6.69  |
| 2006 | 9.33  | 11.00 |
| 2007 | 13.38 | 16.88 |
| 2008 | 10.70 | 9.57  |
| 2009 | 6.63  | 6.64  |
| 2010 | 9.98  | 9.89  |



Because of this close correlation, and in the absence of public market for trading stainless steel, Keywell based the prices for which it sold its processed stainless

steel scrap on prevailing nickel prices reported from the London Metal Exchange. DX 02-0216 at 37.

Nickel/stainless prices affected Keywell's profitability in two ways.   First, if Keywell's material margin—the difference between its purchase and sale prices—remained at the same percentage of the purchase price, the dollar amount of the material margin would rise or fall with the scrap price.   For example, a 20% margin rate applied to scrap purchased at $1.00 per pound would produce a margin of 20 cents per pound, while the same rate applied to a purchase price of $2.00 per pound would produce a per pound margin of 40 cents.

There was a second, and more significant, effect of nickel price changes on the amount of Keywell's margin. Keywell held scrap in inventory for processing before sale.  See DX 17-0002, showing that from 1999 to 2006, Keywell's inventory turned over an average of 10.5 times each year, a turnover about once every 35 days.   Because Keywell based its sale price on the nickel price prevailing at the time of sale, change in nickel prices during inventory retention would change Keywell's material margin independent of the charge Keywell added for its services.   Increases in nickel prices during retention would increase Keywell's profit margin, and decreasing nickel prices would reduce it.

Keywell could have limited the effect of nickel price changes by hedging—purchasing contracts to sell nickel in the future at the price prevailing when it purchased stainless steel scrap. See DX 02-0202, calculating the reduction in Keywell's 2008 losses if it had used a hedging program during the last eight months of that year. But instead of hedging, Keywell's strategy was to sell its inventory quickly. 5/12 Trial Tr. 139-41; DX 02-0216 at 37-38, noting that fast inventory turnover would reduce the effect of market price changes on the Keywell's operational results. At the same time, Keywell appears to have chosen to hold inventory longer during market upswings. In 2006, with rapidly rising prices, Keywell increased its scrap inventory nearly 2-1/2 times (from about 13,000 to 32,000 tons) and increased its inventory retention period from less than one month to over two months. DX 01-0134 at 34. These changes in inventory management substantially augmented Keywell's 2006 earnings, but added inventory increased the negative earnings effect of later declines in nickel/stainless prices, as reflected in the following chart:[5]

---

[5] Changes in nickel price are drawn from DX 03-0085 (pdf) at 1. From the end of December 2005 to the end of December 2006, nickel prices rose from $6.10/lb. to $15.68/lb., an average increase of about 8.1% per month.   In 2006 Keywell purchased stainless steel scrap for $433,310,000. DX 01-0028 at 2 (Stainless).  Since Keywell held purchased scrap that year for more than two months, the value of the scrap sold each month increased by at least the 8% average nickel price increase before it was sold, adding 8% to Keywell's selling

| Year | Cost of stainless steel sold (thousands) | Average progressive monthly change in nickel price | Effect of commodity price change on income (thousands) | Reported net income (thousands) | Net income without the commodity price effect (thousands) |
|---|---|---|---|---|---|
| 2006 | $ 342,107 | +8.1% | $ +27,711 | $ 50,087 | $ 22,376 |
| 2007 Jan-May | 244,840 | +8.6% | +21,056 | 49,869 | 28,813 |
| 2007 June-Dec | 226,511 | -9.6% | -21,745 | 5,215 | 26,960 |
| 2008 | 343,040 | -9.0% | -30,874 | -19,414 | 11,460 |
| 2009 | 141,284 | +4.7% | +6,640 | -942 | -7,582 |
| 2010 | 253,147 | +2.9% | +7,341 | 6,482 | -859 |
| 2011 | 263,833 | -2.3% | -6,068 | -5,384 | 684 |
| 2012 | 207,375 | -0.3% | -622 | -6,132 | -5,510 |

The effect of changes in nickel price—both on Keywell's charge for its services and on the price of stainless steel retained in inventory—was substantial. Keywell's largest profits were realized when nickel/stainless prices were rapidly increasing to high levels and its weakest profitability was with prices falling to low levels.

b. *Sales volume.* Sales volume had a direct effect on Keywell's profitability. As long as there were marginally profitable sales, increased volume would result in greater earnings. But sales volume affected profit in another way. As noted above, in periods of falling nickel prices the value of Keywell's

---

price, and so increasing Keywell's material margin and its net income, set out in 01-0028 at 1 (Summary). The chart sets out the effect of commodity price changes during inventory retention in 2008-12, again assuming retention of at least one month before sale. For 2007, with a sharp break in nickel prices, monthly assessments of the effect on Keywell's earnings are given. The monthly cost of stainless steel sold is calculated by taking 90.8% of monthly total yard sales set out in DX 01-0035. (The portion of total yard sales attributable to stainless steel sales was 90.8% on a year-to-date basis at the end of August 2007 and was projected to remain at that level for the rest of the year. DX 05-0038 at 7. ) Net income is set out as recorded in DX 01-0028 at 1 (Summary).

stainless steel inventory would also fall, a result that Keywell sought to limit by rapid inventory turnover. However, quick turnover—within a month of purchase—depended on monthly sales volume being equal to monthly inventory purchases. If sales volume was less than monthly purchases during a time of falling nickel prices, Keywell would have to hold the inventory for longer periods, increasing declines in its inventory value and so its income.[6]

The following chart shows the effect that nickel prices and sales volume had on the profitability of Keywell's stainless steel business.[7]

| | Average annual nickel price per pound | Stainless steel shipped (gross tons) | Stainless steel net income (thousands) |
|---|---|---|---|
| 2001 | $ 2.71 | 228,274 | $ -3,995 |
| 2002 | 3.07 | 245,589 | -296 |
| 2003 | 4.37 | 216,653 | 5,162 |
| 2004 | 6.30 | 236,214 | 15,738 |
| 2005 | 6.69 | 198,422 | 4,505 |
| 2006 | 11.03 | 196,373 | 31,941 |
| 2007 | 16.89 | 174,718 | 41,803 |
| 2008 | 9.58 | 148,142 | -20,916 |
| 2009 | 6.64 | 116,228 | -337 |
| 2010 | 9.89 | 131,196 | 5,505 |
| 2011 | 10.40 | 125,751 | -5,417 |
| 2012 | 7.95 | 129,421 | -6,303 |

---

[6] This was a particular risk with scrap that Keywell processed for AK Steel, its largest customer. Under a consignment arrangement between the parties until March 2012, AK's price for scrap steel purchased from Keywell was not determined until AK actually melted the steel. 5/13 Trial Tr. 44 (noting that the price for most customers was set when the product shipped). So if prices of nickel were falling, AK Steel could obtain a lower price by delaying the melting of delivered steel, and if prices were rising, AK Steel could melt the scrap immediately on delivery to avoid paying Keywell a higher subsequent price. *Id.*

[7] Nickel prices through 2010 are set out in DX 03-0085 (pdf) at 1. The remaining data is reported in DX 01-0028 at 2 (Stainless).

3. *Titanium and high temperature alloys.* The other metals that were part of Keywell's business had a smaller effect on its profitability, but were also affected by commodity prices changes, though not to the extent of the effect on stainless steel. Keywell's net income for these other metals is compared to its stainless steel income in the following chart, drawn from DX 01-0028 at 2 (Stainless) and 3 (Ti & High Temp).

|  | Stainless steel net income (thousands) | Titanium and high tempera-ture alloys net income (thousands |
|---|---|---|
| 2001 | $ -3,995 | $ 1,009 |
| 2002 | -296 | 23 |
| 2003 | 5,162 | 2,715 |
| 2004 | 15,738 | 9,863 |
| 2005 | 4,505 | 15,186 |
| 2006 | 31,941 | 18,146 |
| 2007 | 41,803 | 16,890 |
| 2008 | -20,916 | -1,502 |
| 2009 | -337 | -605 |
| 2010 | 5,505 | 977 |
| 2011 | -5,417 | 33 |
| 2012 | -6,303 | 171 |

4. *Loan availability.* Keywell's major source of borrowing, throughout the relevant periods, was on a revolving line of credit ("revolver") with either LaSalle or BofA. The line of credit was secured by all of Keywell's assets other than those subject to capital leases, and the amount that Keywell could borrow on the line—its "loan availability"—was a percentage of its eligible accounts receivable and inventory, limited by an availability cap. See DX 01-0001 at 11. Eligibility and the cap amount were defined by loan agreements, which were frequently amended based on changes in Keywell's financial situation. A listing of the revolving loan amount available to Keywell from June 2005 through August 2013 is set out in DX 26-0042.

5. *Cash.* Keywell kept only a small amount of its current assets in cash. For example, its audited financial statement for 2010 shows a cash balance of less than $43,000, compared to total current assets—largely accounts receivable

and inventory—of over $55 million. DX 05-0052 at 4. Under this financial arrangement, both to purchase new scrap and to cover its operating expenses and distributions, Keywell relied on the collection of accounts receivable from its prior scrap sales. If receipts from accounts payable were insufficient to cover new purchases, operating expenses, and distributions to members, Keywell would draw on its line of credit or other borrowing. 5/11 Tr. 230-31 (testimony of Tauber: "The company . . . never had cash . . . [T]he line was like our cash.")

6. *Distributions.* Keywell's operating agreement provided for the firm to make cash distributions to its members to the extent that the firm had "Available Cash," and cash availability was to be determined in the sole discretion of Keywell Manager. DX 17-0011, § 7.6(a). The agreement provided for distributions from Available Cash to assist members in paying their income tax liabilities, but only to the extent that Keywell Manager found that such tax distributions were necessary, *id.* at § 7.6(c). Although these provisions made all distributions discretionary, Keywell treated tax distributions as mandatory, and regularly made distributions to its members in an amount equal to 45% of the taxable income that Keywell generated. 5/11 Tr. 175-76; 256-57 (Tauber).

Keywell made special, non-tax distributions to the members after a determination by the Keywell Manager board. In 2005 and 2007, after Keywell had generated substantial income, the firm made two large special distributions rather than retaining the income in cash or other liquid assets, resulting in minimal members' equity. The following chart shows distributions and members' equity or deficit using both LIFO and FIFO accounting, and indicates that Keywell distributed nearly all of its net income to its members, retaining very little as equity.[8]

---

[8] LIFO (Last In First Out) accounting measures the income from sales of inventory by treating the most recently purchased inventory (last in) as being sold (first out). Since last-in inventory is usually more expensive than what was purchased first (first-in), LIFO decreases income—lowering income tax—but also decreases inventory value and member equity compared to the FIFO accounting generally used by Keywell.

Data in the chart is drawn from DX 01-0028 (Summary) at 1 for net income; from DX 01-0029 for distributions; from audited financial reports, DX 02-0186 through 02-0188 and 05-0046 through 05-0053, for LIFO member equity/deficit; and from comparative balance sheets, DX 05-0063 through 05-0079, and DX 26-0038 at 9, for FIFO member equity/deficit.

| Year end | Net income | Distributions | | LIFO member equity /deficit | FIFO member equity /deficit |
| --- | --- | --- | --- | --- | --- |
| | | Tax | Special | | |
| 2001 | $ -2,986,000 | $ 3,976,109 | | $ -2,417,456 | $   872,000 |
| 2002 | -273,000 | | | -6,835,352 | -2,675 |
| 2003 | 7,877,000 | 1,257,754 | | -11,780,405 | 3,330,000 |
| 2004 | 25,601,000 | 4,640 | | 9,110,696 | 28,546,000 |
| 2005 | 19,691,000 | 14,794,795 | $30,000,000 | -17,814,871 | 1,270,000 |
| 2006 | 50,087,000 | 10,499,063 | | -23,867,214 | 39,172,834 |
| 2007 | 58,693,000 | 3,458,401 | 39,848,058 | 5,604,157 | 48,489,699 |
| 2008 | -22,418,000 | 29,326,114 | | -8,521,330 | -264,856 |
| 2009 | -942,000 | | | -17,683,394 | 5,663,754 |
| 2010 | 6,482,000 | | | -28,052,898 | 11,941,806 |
| 2011 | -5,384,000 | | | -13,694,066 | 6,848,063 |
| 2012 | -6,132,000 | 381,272 | | -16,259,463 | 253,511 |
| Total | 133,282,000 | 63,698,148 | 69,848,058 | | |

7. *Confidential financial information.* Keywell made no public disclosure of its financial condition, and, in particular, Keywell did not disclose financial information to its trade creditors. 5/11 Tr. 301.  Management cautioned members not to disclose Keywell's financial status.  See Lozier's notes for addressing the 2007 membership meeting: "Everything we cover here is confidential. You are here because you have been able to keep information confidential in the past. So . . . keep it zip-lock shut regarding the information we discuss today." PX 006 at 1.

## C. The five challenged transactions

1. *The May 2007 special distribution.*  On May 2, 2007 the Keywell Manager board approved a special distribution of $39,848,058. DX 01-0135 at 1, 3; DX 02-0137 at 28.  This was consistent with Keywell's practice of distributing most of its net income—over $50 million in 2006—to its members.  Keywell's financial condition at the time of the distribution supported it.  A sharp increase in nickel prices that began in the first quarter of 2006 continued throughout the

first quarter of 2007 and Keywell's income rose with it, so that for that quarter alone, Keywell had additional net income of nearly $28 million.[9]

|  | Nickel price per pound, last month of the period | Net income per period (thousands) |
|---|---|---|
| 2006  1st Q | $  6.76 | $  6,258 |
| 2006  2nd Q | 9.41 | 13,028 |
| 2006  3rd Q | 13.67 | 17,696 |
| 2006  4th Q | 16.68 | 13,015 |
| 2007  1st Q | 21.01 | 27,797 |

However, Keywell's cash—consistent with its general financing approach—was insufficient to fund the special distribution. Instead, Keywell had to renegotiate its existing financing agreements. An amendment increased Keywell availability under the revolver and created a $25 million term loan. DX 02-0013. All of the funds that Keywell distributed to its members in 2007 were from loans; none came from cash on hand. 5/11 Trial Tr. 230.

As a result of these transactions, Keywell's balance sheet for June 2007, the first quarter following the special distribution, shows that its assets, reported on a LIFO basis, were worth less than its liabilities. DX 05-0061 at 1 (stating a shareholders' deficit of $8,441,411). However, on a FIFO basis, Keywell reported shareholders' equity of $54,598,637, DX 05-0064 at 1. The expert retained by the defendants concluded that, as a going concern, Keywell was worth $187 million more than its liabilities. DX 01-0001 at 5 (Grabowski). And while the trustee's expert did not give an opinion as to Keywell's value in May 2007, he did—as noted below—conclude that the value of Keywell's assets exceeded its liabilities even after Keywell made a substantial tax distribution in 2008. PX 447 at 84 (Frantzen). Finally, although Keywell reported typically small cash holdings—$3,435—on the June 2007 balance sheet, it had at that time availability of over $65 million under its revolver, DX 26-0042 at 9, and was at no risk of being unable to conduct its business due to a lack of capital.

2. *The 2008 tax distributions.* At its March 2008 meeting, the Keywell Manager board accepted a report from its CFO stating that $23.9 million would

---

[9] The following chart draws nickel prices from DX 03-0084 at 10, and net income figures from DX 05-0057 through 05-0060, with net income for the fourth quarter of 2006 derived by subtracting the net income for the first three quarters from the 2006 annual net income reported on DX 01-0028.

be distributed to Keywell members for 2007 tax liability. There was no reported
discussion about this distribution, and no determination that the distribution
was necessary to allow members to pay their taxes. Since, less than a year ear-
lier, the members had received a special distribution substantially greater than
any tax liability arising from Keywell's 2007 income, the members would have
had the ability to pay their 2007 income tax liability without the tax distribu-
tion. Rather than being based in necessity, the tax distribution was made in
keeping with Keywell's practice of paying tax distributions automatically. An
additional $3 million tax distribution was reported to be anticipated income
generated in the first quarter of 2008. DX 01-0139 at 46. The actual tax distri-
bution made in March 2008 for 2007 tax liability was $26.5 million, DX 01- 0140
at 20, and Keywell made another quarterly tax distribution of $2.8 million in
the second quarter of 2008, DX 01-0141 at 31, bringing its total tax distributions
in 2008 to $29.3 million. DX 01-0143 at 42.

These distributions were made under less favorable financial conditions
than existed at the time of the special distribution. Nickel prices had fallen
sharply in the second half of 2007—with a corresponding effect on Keywell's net
profit—and rebounded only slightly in the first quarter of 2008. However, Key-
well's operations remained profitable.[10]

|  | Nickel price per pound, last month of the period | Net income per period (thousands) |
|---|---|---|
| 2007  1st Q | $21.01 | $27,797 |
| 2007  2nd Q | 18.92 | 38,477 |
| 2007  3rd Q | 13.40 | -3,091 |
| 2007  4th Q | 11.79 | 4,490 |
| 2008  1st Q | 14.17 | 8,473 |
| 2008  2nd Q | 10.22 | 4,790 |

Accordingly, although Keywell's balance sheets for the first and second
quarters of 2007 again showed LIFO shareholder deficits—$12.4 million for the
first quarter, and $10.5 million for the second quarter—FIFO reporting showed
continued substantial shareholder equity—$30.4 million for the first quarter

---

[10] The following chart draws nickel prices from DX 03-0084 at 10, and net
income figures from DX 05-0060 through 05-0064, with net income for the
fourth quarter of 2007 derived by subtracting the net income for the first three
quarters from the 2007 annual net income reported on DX 05-0063.

and $32.4 million for the second quarter. DX 05-0063 at 1 and DX 05-0064 at 1. Taking going concern value into consideration, both experts concluded that Keywell's asset value exceeded its liabilities in March 2008, though the trustee's expert found a much smaller excess. DX 0001 at 5, PX 447 at 84. Neither expert gave a valuation for June 2008, following the second tax distribution, but this distribution would not have had a material effect on their conclusions.

The effect of the tax distributions on Keywell's capital was significant. In a memorandum of October 2009, Michael Sheffieck, Keywell's CFO, stated that "[t]he significant financial stress created by recent capital expenditures and the timing of shareholder distributions caused the Company to be significantly undercapitalized presently." DX 17-0075 at 6. The capital expenditures to which the memo refers were purchases of rail cars from 2006 to early 2008; the referenced shareholder distributions were the 2007-08 special and tax distributions. *Id.* at 3. Sheffieck found inadequate capitalization on two grounds: solvency benchmarks established by Dun & Bradstreet and comparisons to public companies in the same business lines as Keywell. *Id.* at 4. Public company data for March 2008 is not part of the record, but the D&B benchmarks can be applied to Keywell's March 2008 balance sheet, DX 05-0063 at 1, with the following results.

| D&B ratio | Keywell balance sheet data | D&B benchmark standard | Keywell status March 2008 |
|---|---|---|---|
| Current Liabilities /Equity | 75,054,549 /30,448,540 | No more than 0.8 to 1 | 2.46 to 1 |
| Total Liabilities /Equity | 137,884,468 /30,448,540 | No more than 1 to 1 | 4.53 to1 |
| Debt/Equity | 73,065,126 /30,448,540 | No more than 1 to 1 | 2.40 to 1 |

This indicates insufficient capitalization. However, at the end of March 2008, Keywell still had loan availability of more than $49 million, and there is no evidence in Keywell's business documents suggesting any need for additional capital at the time.

The situation following the tax distribution, then, is one in which Keywell had sufficient capital to do business, but with a level of capitalization that would have been insufficient under the D&B benchmarks. [11]

---

[11] The ratios in Keywell's balance sheet for June 2007, the first quarterly report after the special distribution, also exceed the D&B benchmarks, but to a much smaller extent, with current liabilities/equity at 1.46 to 1, total liabilities/equity at 2.46 to 1, and debt/equity at 1.12 to 1. See DX 05-0064 at 1.

3. *The 2009 NewKey I loan.* Immediately after the 2008 tax distributions, Keywell's financial condition plummeted. Nickel prices and sales volumes both declined sharply, Keywell suffered months of net income losses, and its loan availability shrank to dangerously low levels. DX 01-0030.xls; DX 26-0042 at 12-15.

| 2008 | Average nickel price per pound | Shipment volume (gross tons) | Net income | Month end loan availability |
|---|---|---|---|---|
| April | $13.0469 | 15,392 | $ 2,486,252 | $60,915,802 |
| May | 11.6733 | 16,459 | 2,766,n962 | 48,781,011 |
| June | 10.2282 | 12,133 | -463,668 | 20,874,723 |
| July | 9.1446 | 11,342 | -1,729,928 | 36,111,297 |
| August | 8.5856 | 13,406 | -2,301,034 | 34,008,719 |
| September | 8.0716 | 14,970 | -4,793,385 | 34,088,553 |
| October | 5.5066 | 10,852 | -13,839,384 | 19,616,723 |
| November | 4.8542 | 10,660 | -3,473,238 | 6,447,586 |
| December | 4.3937 | 1,980 | -6,554,232 | 3,414,723 |

There was a corresponding effect on Keywell's capitalization. Even with the higher FIFO accounting, there was a member capital deficit of $264,856. DX 05-0066 at 1. This, of course, left Keywell substantially undercapitalized on a balance sheet basis. With negative equity, the D&B benchmark ratios cannot even be computed. Recognizing Keywell's increasing financial difficulty in 2008, Mark Lozier, Keywell's CEO, directed its executive committee to implement a plan at the beginning of October for substantial cost reductions, PX 7, and at one point in November, it appeared that Keywell might need to ask the bank for a temporary advance of funds beyond its availability limit. PX 71.

Most critically, at the end of December 2008, Keywell had breached one of the covenants in its loan agreement. DX 09-0013 at 1. BofA could have ceased lending money to Keywell, and there were no other sources of financing available. 5/19 Tr. 123 (Lozier). This put Keywell in a difficult situation: first, it needed to raise capital, both to sustain its business and to persuade BofA that to continue a lending relationship; but second, it wanted to avoid placing new

---

Based on the D&B benchmarks, Keywell's 2007 special distribution produced a mild capital insufficiency that the 2008 tax distribution exacerbated.

finds into Keywell until a new loan agreement with BofA could be put into effect.
Otherwise, if the business failed, Keywell's assets, even with a cash infusion,
would have been insufficient to pay its creditors, and any contributed cash, ra-
ther than sustaining Keywell, would simply have increased recovery by its cred-
itors. See DX 17-0075 at 1 (Sheffieck memorandum stating that "significant
concerns in December 2008 about the Company's viability required a capital
raise structured in a fashion that would provide better collectability in the event
the Company were to have declared bankruptcy.")

       a. *Initial equity offering.* In November 2008, to deal with the first
issue, raising capital, Keywell decided on a capital call, which Sheffieck thought
should attempt to raise at least $20 million from Keywell's members. PX 247.
At Lozier's direction, 5/18 Tr. 43, Sheffieck then engaged Keywell's law firm,
Patzik, Frank & Samotny ("the Patzik firm"), to draft a cash-only offering of
shares to the members. PX 10. On November 30, Sheffieck asked the Patzik
firm to change the offering to one for preferred shares. PX 11. By December 4,
the firm completed a preferred share term sheet, DX 13-0012, and by December
16, an offering memorandum was prepared, DX 13-0011. The offering had sev-
eral key features:

- It proposed to sell 15 million preferred shares, priced at $1 per share. *Id.,*
  at 1.
- It was sent only to Keywell members and Louis Wagner, Keywell's gen-
  eral counsel. *Id.*
- It offered Wagner 100,000 shares, and offered the members shares in
  proportion to their existing membership interests. *Id.* at 11.
- The preferred shares were to bear a minimum 12% annual return, and if
  not paid, minimum default return of 24%. *Id.* at 16-17.
- The preferred shares were convertible, at the holder's option, into regular
  ownership shares, at a conversion rate of $3 per regular share. *Id.* at 17.
- Distributions and redemptions in connection with regular shares could
  not take place until the preferred shares were redeemed and returns on
  the preferred shares paid in full. *Id.* at 17-18.
- The stated purpose of the offering was "to meet the short-tern capital
  needs of the Company . . . for general corporate purposes, including oper-
  ating and capital expenditures." *Id.* at 14.

       Keywell sent the offering memorandum with a letter to the potential in-
vestors for receipt on Thursday, December 18. On December 17, the day before,
Mark Lozier spoke in a telephone conference to which all of the potential inves-
tors were invited, and for his talk, he followed an outline, PX 94, that he had
read and edited. DX 10-001 at 66 (262 in internal pagination). In his outlined
remarks, Lozier emphasized that the package the recipients would be receiving
should be held in confidence ("Do not share the letter's contents with anyone."

PX 94 at 2); he announced salaried employee pay cuts of 10 to 32%, *id.* at 1-2; and he outlined the main features of the offering memorandum. He noted that if all the Keywell members participated fully, there would be no virtually no dilution of their ownership interests. *Id.* at 2. He stated that both he and Joel Tauber, holders of far the largest shares of membership interests, would be purchasing their proportionate allocation of the preferred shares. *Id.* at 3. Finally, he said that a second conference call would be held on Sunday, December 21, at 2:00 p.m., at which detailed questions about the offering could be raised.

> b. *Change in structure of the transaction.* The preferred share offering never went into effect, however, because of concerns about the second issue, keeping the contributed cash at least temporarily separate from Keywell and its creditors. The original idea was to have the contributions sent to an escrow account under the control of the Patzik firm, with the cash paid into Keywell only after the banking concerns were resolved. Sheffieck made this point in an email message of December 21: "The purposes [sic] of the escrow was to obscure from BofA the amount raised, allow refund to the investors to the raise amount not needed, and allow refund of the entire raise in the event BofA acts precipitously in the near future." DX 15-0013 at 2. But on December 17, the same day as the conference call, Sheffieck sent an email to Steven Prebish, one of Keywell's attorney at the Patzik firm, with the subject ""SGK STOP" and the message "Call me." DX 17-0057. Two days later, on December 19, Prebish sent an email to other attorneys in the Patzik firm, including Alan Patzik, reporting on his communication with Sheffieck, including the cash protection issue:

> > Michael . . . asked who we might suggest for bankruptcy counsel. . . . Also, Michael is trying to figure out how to collect the funds but not expose them (and retain the right to get them when they want). I told him that they couldn't retain the right to get the funds whenever they want and still argue that they are not subject to creditors. We talked it through and didn't come up with a great solution. I did not suggest he pay a massive prepayment retainer to a bankruptcy guy—figuring that would just rub salt in the wounds.

DTX 17-0057.

> On the next day, Saturday, December 20, Patzik sent an email to Sheffieck, suggesting that Keywell meet with Fruman Jacobson, head of the bankruptcy group at the Sonnenschein firm. PX 17. Sheffieck agreed, 5/12 Tr. 51, and later that day, Jacobson was contacted and emailed Patzik saying that he would be available to meet with Keywell personnel on Sunday, December 21. DX 15-0002. On Sunday morning, Patzik emailed Jacobson enclosing Keywell financial information. DX 15-0008 at 2. At noon that day, Jacobson responded, stating that he would review the material and that he would be available for a

phone call that afternoon. *Id.* At 1:07 p.m. that day, Sheffieck sent an email to Jacobson asking "[H]ow do we legally keep the money from BofA but accessible to the Company? Can we achieve all of the purposes of the escrow? And can we get answers before 2:00 today so our investor/shareholder conference call goes smoothly? *Id.* at 1.[12]

Jacobson did have a conversation with Sheffieck on December 21, and Sheffieck recorded its contents in a page of handwritten notes, PX 23, 5/12 Tr. 65. The notes contain Jacobson's advice about the receipt of funds for Keywell:

> Contingent on corporate structure—do not denominate as equity, has to be done as a series of steps. All discussions are discoverable in a process. Be very careful on wording.

> Funds being put together, we have no right to the funds until re-structure occurs. Shareholders have to approve.

> Don't sent $ until

---

[12] An email from Patzik on December 21, with Sheffieck as a recipient, also indicates that Keywell's concern after the December 17 conference call was to protect shareholder contributions from creditors:

> [M]y partner Steve Prebish has expressed concern that the amount placed in escrow from the equity raise would actually be an asset of the company and recoverable by the company's creditors.

> The idea is to have the money funded and ready, but maintained off the company's books and outside the reach of creditors until needed.

> [W]hat we are looking for is a way to accept the subscriptions from investors . . . and put in place some form of agency or escrow agreement whereby the money is held by a third party and would not be released by the third party to the company unless and until certain conditions are satisfied. For example, maybe the condition is the completion of a loan modification with the Bank group . . . .

> Michael, am I communicating it correctly?

DX 16-0013. Sheffieck confirmed that Patzik's summary was correct.. *Id.*

If we meet restructure conditions, then we will have quick access to funds.

From these emails and Sheffieck's notes, it is apparent that—as Sheffieck had requested—Jacobson consulted with him just before the scheduled 2 p.m. conference call with investors. An email that Jacobson sent to one of his partners at 2:43 that afternoon confirms this: "Reviewed a bunch of docs, spoke to Alan a few times, then with the client on a very sensitive mission they are currently on (to prep him for a call)." DX 15-0012. Jacobson's advice to Sheffieck was to discard the preferred share approach and replace it with a corporate restructuring that would not involve adding equity. Jacobson was anxious later that afternoon "to hear how Michael's call went," likely because he wanted to know how his advice had been received. DX 15-0015.

The advice was largely accepted. On Monday, December 22, in a conference call with attorneys from the Patzik firm, Lozier, and Sheffieck, Jacobson repeated his advice: Keywell should "forget equity," should withdraw the preferred stock offering, should negotiate with BofA based on a "restructured entity," recognizing that Keywell would "[n]eed add'l financing to make ends meet," and should keep bankruptcy as a backup. PX 25 (Sheffieck notes of the meeting); 5/12 Tr 69, 72-73 (Sheffieck testimony). On Tuesday, December 23, Sheffieck and the Patzik attorneys, following Jacobson's advice, discussed a new approach: "restructuring the deal" with a "new Delaware LLC . . . which will purchase a 12% Unsecured Convertible Note from Keywell." DX 16-0020. On the next morning, December 24, Lozier emailed Prebish that he was "good with this approach." DX 16-0021.[13]

Based on testimony from Keywell personnel, the defendants have proposed a somewhat different version of the events leading to the change from Keywell's preferred note offering. Proposed Findings of Fact at 67-75, ¶¶ 371-424. As this version has it:

- Tauber and Lozier had always conceived of raising capital through loans;
- Tauber in particular did not want to make an additional equity contribution because of his age and desire to use his money in charitable activities;

---

[13] Only Jacobson's advice about a bankruptcy backup was not followed. On December 23, he directed his firm to prepare for a possible bankruptcy filing, and made arrangements for a meeting that day with Keywell personnel. DX 15-0036. However, that meeting was postponed to allow for further work on the new capital offering. PX 24. There is no indication of further bankruptcy discussions between Jacobson and Keywell personnel in 2008 or 2009.

- after the December 17 conference call, Tauber changed his mind about purchasing preferred shares and so the Patzik firm was directed to stop work on the preferred share project;
- Keywell never considered retaining Jacobson for any advice about bankruptcy but only for assistance in negotiating with BofA and protecting capital contributions;
- Keywell had proposed an equity-based program for raising capital only because BofA would not likely approve subordinated loans issued by Keywell; and
- When, during a football game on December 22, BofA personnel expressed no objection to subordinated borrowing by Keywell, Lozier directed the change from the preferred share offering.

The documents discussed above, however, (1) give no indication of any reluctance by either Tauber or Lozier to make new equity contributions; (2) indicate that the preferred stock offering continued to be the intended vehicle for raising capital after the December 17 conference call and until Jacobson advised against it; (3) reflect that Jacobson was hired precisely for his bankruptcy expertise, and (4) contain no expression of concern within Keywell about a refusal by BofA to approve subordinated borrowing and no reference to any discussion of subordinated borrowing with BofA on December 22.[14]  The defendants' version of these events, inconsistent with the contemporary documents, is not credible.

       c. *Completion of the NewKey I transaction.*  Keywell promptly put into effect its decision to raise capital through a loan to a new Delaware LLC. In an email of December 26, Sheffieck informed the prospective investors in preferred stock that although "[t]he financial situation and need have not changed," changes were being made "concerning protection of the investment," subject to legal review. PX 268 at 1.  On December 29, another email from Sheffieck informed the investors of the creation of NewKey, LLC ("NewKey I"), managed by NK Management, LLC ("NewKey Manager"), wholly owned by Lozier and Tauber.  Rather than purchasing preferred shares of Keywell, the investors would be offered membership interest in NewKey I, which would in turn purchase a promissory note from Keywell, payable in two years with a one-year extension at Keywell's option.  PX 147 at 2-3.  A conference call with the investors was held on December 30, at which Lozier told them that the note would be unsecured and that both he and Tauber intended to purchase membership shares

---

    [14] When Keywell sought an amended loan agreement in January, the bank's position was that new capital should be in the form of equity, not borrowing.  PX 130, 5/15 Tr. 72 (Sheffieck).  The football game conversation with BofA personnel  likely indicated that BofA was open to an amended loan agreement, not that it was open to Keywell taking on subordinated debt.

in NewKey I. 5/15 Tr. 280-81 (Lozier). On December 31, Keywell issued a for-
mal revocation of its preferred debt offering and letter of December 16, includ-
ing an underlined statement that Keywell Manager "has determined to revoke
the Letter in its entirety and the Letter will be henceforth considered as if it
had never been issued." The investors were requested to "destroy all copies of
the Letter." The request was made to prevent confidential information being
disseminated outside the company. 5/14 Tr. 49 (Sheffieck). A confidential pri-
vate placement memorandum, DX 10-0003, with the same date, was issued to
the potential investors.

The major financial difference between the proposed NewKey I invest-
ment and the revoked preferred share offering was in the level of protection of-
fered to the investors. Instead of holding new equity in Keywell, which would
be subordinate to the claims of all creditors, an unsecured note of NewKey I
would be subordinate only to Keywell's secured creditors, principally BofA, and
it would share equally with other unsecured creditors in collection against Key-
well's remaining assets. Other features of the NewKey I investment were iden-
tical to the preferred share offering:

- The offering was for up to 15 million shares of NewKey I, priced at $1 per
  share. DX 10-0003 at 13.
- The offering was only made to Wagner and members of Keywell. *Id.* at 2.
- Wagner was allowed to invest $100,000 and the members were offered
  shares in NewKey I proportionate to their ownership interests in Keywell.
  *Id.* at 11.
- The NewKey I note would be bear interest at an annual rate of 12% and a
  default rate of 24%. *Id.* at 7-8.
- The note would be convertible into Keywell shares at a price of $3 per
  share. *Id.* at 1.
- The note would be used "to meet the short-tern capital needs of the Com-
  pany . . . for general corporate purposes, including operating and capital
  expenditures." *Id.* at 1, 13.

On January 28, 2009, NewKey I received the last funds from investors,
totaling $12.7 million. 5/14 Tr. 71 (Sheffieck). The purchases largely, but not
completely, tracked ownership percentages in Keywell. Ex. C to Answer to
Amended Complaint, Adv. Docket 152 at 134.

Even before NewKey I was funded, Keywell began negotiating with BofA
for amended financing arrangements. On January 28, the bank responded with
a proposal that, as noted above, included equity contributions—not loans—to
support Keywell's finances. PX 130, 5/15 Tr. 72 (Sheffieck). Ultimately, howev-
er, the bank personnel working with Keywell recommended amended loan
terms based on the company receiving a $3.5 million subordinated loan, PX 128

at 2, and indicated that the loan could be secured by a second lien on Keywell's assets. PX 483 (email from Prebish). A formal amendment to bank's loan and security agreement was executed on March 20. DX 09-0013.

Keywell issued a promissory note to NewKey I in the amount of $3.5 million, and entered into an agreement securing the note, both dated March 20, 2009. DX 28-0075, Recitals A and B. NewKey I, in turn, transferred to Keywell both $2 million, which was used to reduce Keywell's revolving loan balance, and real property that NewKey I had purchased for $1.5 million, as reflected in the amended loan agreement. DX 09-0013 at 1. NewKey I retained the $9.2 million balance of its funds, subject to a representation in the offering circular that funds not used by June 30, 2009 would be returned to the investors. DX 10-0003 at 14.

The secured status of the new loan changed the effect on the investors. Instead of sharing equally with unsecured creditors, the NewKey I loan would now be payable in full before unsecured creditors had a right to payment.

Keywell's auditors delayed issuing a report for 2008 based on going concern considerations and issued the report only after (1) the amendment to the loan agreement removed Keywell's default and (2) the NewKey I funding indicated "ownership's commitment to the Company and ability to raise sufficient capital for future infusions." PX 180 at 1, 11.

4. *The 2011 NewKey II loan.* Following the New Key I transactions, Keywell's financial situation did not immediately improve. The company experienced a net income loss of $529,806 for the first quarter of 2009, it projected a loss of another $1.5 million for April, and member equity, reported using the higher FIFO accounting, fell to a deficit of $786,707. DX 01-0144 at 14, 16, 19. However, with rising nickel prices (shown on DX 03-0085 at 1), Keywell showed net income for the year as of October 2009. DX 01-0146 at 37.

The upturn in 2009 had two consequences. First, it encouraged other firms to propose making equity investments in Keywell, as discussed in an October 28 memorandum from Sheffieck to Lozier. DX 17-0075 at 7-8. Sheffieck called for Keywell to obtain at least $25 million in new capital to overcome the undercapitalization that he found, comparing Keywell to both comparable companies and Dun & Bradstreet benchmarks. *Id*. at 2, 4-5. Second, it led members of NewKey I to purchase new shares of Keywell when the unused balance of their membership payments was made available to them. This amounted to a $6.2 million equity infusion to Keywell. DX 07-0040. However, no agreement for an equity investment was reached with an outside firm, and the equity contributed by NewKey I members was much less than the new capital that

Sheffieck's memorandum called for. With a decline in nickel prices in November and December, Keywell actually ended the year with a small net income loss, DX 03-0085, DX 01-0028 (Summary), and its member equity (using the higher FIFO accounting), as reported in DX 05-0069, reflects that Keywell failed the D&B benchmarks by a substantial margin even after the share purchases.

| D&B ratio | Keywell balance sheet data | D&B Benchmark standard | Keywell status December 2009 |
|---|---|---|---|
| Current Liabilities /Equity | 19,710,583 /5,663,754 | No more than 0.8 to 1 | 3.48 to 1 |
| Total Liabilities /Equity | 70,442,101 /5,663,754 | No more than 1 to 1 | 12.44 to1 |
| Debt/Equity | 53,464,549 /5,663,754 | No more than 1 to 1 | 9.44 to 1 |

In 2010, there was an increase in nickel prices, resulting in $6.5 million in annual net income for Keywell, its first year with net income since 2007. DX 03-0085 (pdf) at 1, DX 01-0028 (Summary). However, in 2011 nickel prices declined again, and—despite extending the maturity date of the NewKey I note from March 1, 2011 to March 1, 2012, PX 53, and so not paying the $3.5 million that would otherwise have been due—Keywell again went into default under its loan agreement with Bank of America. In a memorandum submitted to BofA in March 2012, Keywell stated that "2011 performance was adversely affected by a continuous decline in nickel pricing and falling customer volumes following Q1 2011," and it acknowledged that "[t]he Company has been capital challenged in the last few years as a result of its financial performance," DX 23-0028 at 3. The memorandum set out a timeline including the following items:

- **October 2010:** Keywell fell below the minimum 15% availability threshold outlined in [the BofA loan agreement], triggering the reporting of its fixed charge covenant on a monthly basis.
- **June and September 2011**: The Company fails to meet the fixed charge covenant.

*Id.* at 5.

To deal with this situation, one of Keywell's major responses was to negotiate an agreement with Trafigura, an industry broker and trader, under which Trafigura would both lend up to $10 million to Keywell to build out its operations in California and act as Keywell's marketing agent in Asia. *Id.,* PX 302 at 7, DX 28-0070 at 3. But no agreement with Trafigura ever went forward, DX 13-0001 at 42 (pdf) (Hyman deposition), and Keywell had no other source of out-

side financing.  5/15 Tr. at 150-51 (Sheffieck).

Keywell's other response was to obtain internal financing.  Beginning in late August, Sheffieck instructed the Patzik firm to draft a set of documents mirroring those used for NewKey I, for a new entity again to purchase a note from Keywell. PX 56, 300.  This led to a private placement memorandum dated September 28, 2011, for NewKey Group II, LLC ("NewKey II"), DX 28-0070, setting out terms nearly identical to NewKey I's documentation.  NewKey Manager, owned by Tauber and Lozier, would also manage NewKey II, *id.* at 13, the term of the note would be a similar three years, *id.* at 17, and other identical features included the following:

- The offering (for up to 5 million shares of NewKey II), was priced at $1 per share. *Id.* at 2.
- The offering was only made to existing Keywell shareholders (now including Wagner). *Id.* at 2, 38.
- Existing Keywell shareholders were offered shares in NewKey II proportionate to their ownership interests in Keywell. *Id.* at 50.
- The NewKey II note would bear interest at an annual rate of 12% and a default rate of 24%. *Id.* at 7-8.
- The note would be convertible into Keywell shares at a price of $3 per share. *Id.* at 18.
- The note would be used "to meet [Keywell's] short-term capital needs . . . for general corporate purposes, including operating and capital expenditures." *Id.* at 14.

Originally, Keywell intended to use NewKey II note proceeds to expand its facilities, but in an outline that he prepared for a meeting with the bank lenders on September 26, Sheffieck noted the low availability under Keywell's revolving loan and stated that "[o]bviously, that expansion is now on hold until the availability situation returns to the [originally] contemplated levels." PX 55 at 1; DX 17-0060 at 44 (Sheffieck deposition).  In an October 7 conference call with Keywell members, Lozier said that Keywell needed the NewKey cash immediately because of the low availability, 5/15 Tr. at 204 (Beninato), and one Keywell shareholder reported that Sheffieck "mandated that I wire my NKII funds by 10/18/11 (overnighting a check was not acceptable) because Keywell had an availability 'issue' and needed immediate access to the money." PX 601 at 2.

By October 18, Keywell members had transferred $5 million to NewKey II, 5/12 Tr. at 152, and Keywell immediately took possession of the funds through a NewKey II note, DX 07-0023—before BofA had approved the subordinated lending, PX 60 at 3 (Prebish email).  Keywell used the $5 million to reduce the indebtedness on its revolver, 5/12 Tr. at 152, and so increased its

available credit by that amount. The October 18 availability increase later became essential; from November 29 through December 1, Keywell's loan availability—with the increase—was under $5 million. DX 26-0042 at 25. On October 18 also, NewKey I agreed with Keywell for another extension of the maturity of its loan until 2014. DX 02-0025 at 2.

BofA ultimately executed, on November 21, 2011, an amendment to Keywell's loan agreement. The amendment provided that the lenders would forbear from exercising their rights resulting from Keywell's defaults until December 31, 2011. DX 09-0021. Among the defaults listed were Keywell's issuing secured subordinated debt to NewKey II and amending the NewKey I loan agreement without BofA's prior written consent. *Id.* at 20. Although the amendment recognized the New Key II note and the amended New Key I note as operant documents, these defaults were expressly not waived. *Id.* at 3.

The NewKey II loan proceeds prevented a complete lack of cash, but did not improve Keywell's overall financial situation. On November 9, Lozier, in a memo headed "Tough Action," announced the termination of four employees, four weeks of temporary layoffs for all employees, and other cost cutting. Keywell's net income for 2011 was a loss of over $5 million. DX 01-0028 (Summary). By year-end 2011, even with its 2010 net income, Keywell was significantly undercapitalized as measured against the D&B benchmarks. DX 05-0077.

| D&B ratio | Keywell balance sheet data | D&B Benchmark standard | Keywell status December 2011 |
|---|---|---|---|
| Current Liabilities /Equity | 23,477,506 /6,848,063 | No more than 0.8 to 1 | 3.43 to 1 |
| Total Liabilities /Equity | 70,494,690 /6,848,063 | No more than 1 to 1 | 10.29 to1 |
| Debt/Equity | 49,920,987 /6,848,063 | No more than 1 to 1 | 7.29 to 1 |

5. *Lozier's 2013 loan.* Keywell's financial situation did not improve in 2012. Nickel prices continued to fall that year, DX 03-0085 (pdf) at 1, and Keywell ended the year with a net income loss of over $6 million, DX 01-0028 (Summary) at 1. For several days in November, availability under Keywell's revolving loan was less than $2 million. DX 26-0042 at 29. A number of notices and amendments to Keywell's loan agreements were required to address defaults by Keywell and the withdrawal of BMO Harris and the Royal Bank of Scotland from the lending group for which BofA was the agent.[15] An April No-

---

[15] Sixth Amendment to Second Amended and Restated Loan Agreement (February 7, 2012), DX. 09-0023; Notice of Defaults and Reservation of Rights (April 3,

tice of Defaults specifically asserted as a continuing default Keywell's entering into the NewKey II note and amending the NewKey I note without BofA's prior written consent. PX 120 at 3.

At the beginning of 2013, on Thursday, January 3, Keywell received an email from a bank officer indicating the potential for a complete loss of availability under the revolver: "I noticed that your availability today is really, really tight (under $50,000). I know potentially there's a difference between what our system shows as availability and actual avail but it hasn't been this tight in awhile. Let me know if you think you're going to have an issue over the next couple days." DX 03-0070 at 2. Karen Beninato immediately responded on behalf of Keywell, telling the officer that Keywell's accounting showed about $600,000 in availability and that it would be "controlling disbursements" until it received payments from sales. *Id.* at 1. On the same day, Sheffieck sent an email to Lozier saying that Keywell was "[b]eyond squeaky on availability today." *Id.*

Lozier and Sheffieck then consulted with Keywell's counsel about an immediate loan from Lozier to assure that Keywell would have funds available to pay its ongoing obligations. On Friday, January 4, Steven Prebish wrote the following email to Lozier and Sheffieck giving the status:

> As discussed with Michael, below are the basic terms we discussed for a short term loan from Mark (or an affiliate) to Keywell.
>
> - Mark or an affiliate will loan $1,000,000 today to Keywell in the form of an unsecured short term loan.
> - The loan will be evidenced by a simple form of note.
> - The loan will come due in full on the two week anniversary of its making (or January 18 assuming made today).
> - Interest will accrue under the note at an annual rate of 18% and will be paid in full at maturity.
> - In the event of a default under the note, default interest will be charged at an all-in rate of 24% (the original 18% plus an additional 6%).

---

2012),PX 120; Seventh Amendment to Second Amended and Restated Loan Agreement (April 18, 2012), DX 09-0025; Eighth Amendment to Second Amended and Restated Loan Agreement (June 29, 2012), DX 09-0026: Waiver and Ninth Amendment to Second A&R Loan Agreement (July 18, 2012) DX 09-0027: Waiver to Second Amended and Restated Loan Agreement (July 31, 2012) DX 09-0028; Tenth Amendment to Second Amended and Restated Loan Agreement (August 8, 2012) DX 09-0029; Waiver and Eleventh Amendment to Second Amended and Restated Loan Agreement (December 3, 2012) DX 09-0030.

PX 308 at 3.

On the same day, Prebish exchanged email with another attorney at the Patzik firm, who asked, "Given the short term nature of the loan, how is all of this to be documented, approved by the bank, etc., before the maturity date?" Prebish responded, "Well, we could document it with a simple 1-2 page note and a directors' consent. It would be unsecured. But there ain't no way the bank is going to approve it in an hour or two." *Id.* at 1.

Lozier, however, did not make a loan to Keywell on January 4, but rather on Monday, January 7. During the intervening weekend, an officer of BofA with approval authority told Lozier in a telephone conversation that he was "agreeable with" a proposal from Lozier to make a $1 million bridge loan to Keywell. 6/1 Tr. at 182-83, 86. The actual note that Keywell executed on January 7 was not the short, unsecured note with a two-week term that Prebish had suggested for execution on January 4, but rather a formal, eight-page document, with a 30-day term, titled "Keywell L.L.C. 12% Junior Subordinated Secured Convertible Promissory Note," and including specific references to both a subordination agreement and a security agreement. DX 11-0001 at 3. The note itself demonstrates that at the time of its execution, the same time Lozier transferred funds to Keywell, the intent of both Lozier and Keywell was that the loan would be secured. A subordination agreement between Lozier and BofA and a security agreement between Lozier and Keywell, as specified in the promissory note, were both executed two days later, on January 9. PX 287 (Second Amended and Restated Subordination and Intercreditor Agreement), DX 11-0002 (Security Agreement). Lozier filed a financing statement to perfect his security interest on January 14, DX 11-0003, and the loan was fully paid on February 6, 30 days after it was entered, pursuant to its terms. 5/14 Tr. 121 (Sheffieck).

## D. Events before the bankruptcy filing

Keywell continued to experience negative financial results for the balance of 2013, with net income losses each month until its bankruptcy filing in September. DX 03-0094. By the end of March 2013 Keywell determined it needed the assistance of bankruptcy counsel, contacted bankruptcy attorney Howard Adelman, and retained him. PX 72 at 2-4, 5/19 Tr. 4-5 (Adelman). In connection with the retention, Lozier asked Patzik, his general attorney, "what will happen to the sub debt"—that is, the NewKey I and II loans—either in bankruptcy or with a new lender. Patzik referred the question to his partner Prebish, and received this response in a March 26 email:

> I gave Micheal [sic, referring to Sheffieck] my preview of what
> would happen to the sub-debt; which is that while it theoretically

has priority, there is a very good chance that any trade creditors who do not get paid are going to file a motion to have it equitably subordinated. Michael understands that and knew it before I said it as we discussed it when we first put the debt in place back in 2009. But, we figured it was worth a shot and because the debt has actually been in place for a while, I suppose we could argue that any creditors today were not prejudiced and in fact benefitted from the debt being in place. But who really knows. I did suggest to Michael when I talked to him today that they again consider retaining separate counsel for NewKey I and II.

PX 72 at 1.

Prebish's advice that NewKey be provided with separate representation was eventually followed. Although there may have been earlier contact, Steven Towbin became actively involved in representing NewKey I and II by the end of August. PX 117.

In the first two months of Adelman's representation, Keywell operated on two tracks—seeking an equity investor who would allow the company to overcome its current financial difficulties or arranging a sale of the company as a going concern. 5/19 Tr. at 10. In late May, Keywell received a proposal from Prophet Equity that blended the two approaches, offering a $15 million equity contribution in exchange for a controlling ownership interest and preferred shares, leaving current equity with a 30% ownership interest. PX 137. The offer would have left BofA and trade creditors with their claims intact, but it was conditioned on the debt owned by Keywell shareholders, including the NewKey debt, being converted to preferred shares. Lozier responded with a proposal that the NewKey debt remain and Prophet accept a similar subordinated debt position rather than preferred shares PX 238. It appears that as of June 8, Sheffieck was willing to accept conversion of the NewKey debt into preferred shares. PX 239 at 1-3 (Sheffieck email attaching comments, in all caps, to negotiating points suggested by Patzik). After consulting with Tauber, however, Lozier declined to accept conversion of the NewKey debt, and Prophet withdrew its offer on June 18. PX 113, 114, 122; 15 Tr. 3-4 (Sheffieck).

Two days later, on June 20, the agenda for a Keywell Manager meeting called for approval of a bankruptcy filing. PX 441 at 76. At that meeting, Sheffieck reported that BofA, but no other lender, had been informed of Keywell's intention to file. *Id.* at 80. On July 1, Lozier issued a letter announcing that Keywell was closing three of its facilities and suspending payments for all goods received on or before June 26, but would continue to do business and make payments for goods received after June 26. DX 10-0025.

Operating in this mode, and liquidating unnecessary assets, Keywell generated enough cash to pay all of its indebtedness to BofA and was ready to do so on August 22. PX 81, 317. This bankruptcy case was filed on September 24.

## Conclusions of Law

As noted at the outset of this opinion, the only relief established by the facts set out above is equitable subordination of the NewKey loans. However, the trustee has asserted a variety of claims in her adversary proceeding, and they will be discussed in the order of the counts in the trustee's complaint. A discussion of the NewKey claims will follow.

### A. The trustee's complaint

1. *Counts I and II: fraudulent transfers.* In the first two counts of her complaint, the trustee seeks to avoid the special and tax distributions that Keywell made to its members in 2007 and 2008. Her claims arise under § 544(b)(1) of the Bankruptcy Code, which incorporates state law providing for avoidance of transfers of property—here, Illinois law.

Count 1 is based on 740 Ill. Comp. Stat. Ann. 160/5(a)(2) (West 2014), which would allow avoidance of the distributions if they were constructively fraudulent, that is, if Keywell did not receive reasonably equivalent value for making the distributions, and if Keywell either "(A) was engaged or was about to engage in a business or a transaction for which [its] remaining assets . . . were unreasonably small in relation to the business or transaction or (B) intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due." As set out in *SGK Ventures,* 521 B.R. at 859, the tax distributions were not contractually required, and no other value was given by Keywell's members for the distributions, so the only issue for determination is whether the distributions left Keywell with inadequate assets.

Count 2 is based on 740 Ill. Comp. Stat. Ann. 160/5(a)(1) (West 2014), which allows avoidance of transfers made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Section 160/5(b) lists several factors as bearing on actual intent, generally known as "badges of fraud." *Bank of America v. WS Management, Inc.,* 33 N.E.3d 696, 724 (Ill.App.Ct.2015). The critical factor for the trustee's claim is § 160/5(b)(9), "the debtor was insolvent or became insolvent shortly after the transfer was made."

Both counts then, depend on evidence that the distributions left Keywell financially impaired. Preponderance of the evidence is the applicable burden of proof for constructive fraud, *see, e.g., In re Hennings Feed & Crop Care,* 365 B.R.

868, 875 (Bankr. C.D.Ill. 2007), while actual fraud requires clear and convincing evidence. *Wachovia Sec. LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757 (7th Cir. 2012). But even under the less stringent burden of proof, the evidence does not support the trustee's claims. Keywell was not shown to be insolvent or unable to pay its debts after either of the distributions. The trustee's valuation expert did not address Keywell's solvency after the 2007 special distribution, but he concluded that even after the 2008 tax distribution (a valuation date of March 28, 2008), Keywell was solvent, with its assets worth $3.5 million more— or 4.7%—above Keywell's liabilities. PX 447 at 53. The trustee presented no evidence of insolvency in connection with either of the distributions.

The trustee's expert did offer an opinion bearing on capital adequacy and ability to pay debts. He concluded:

> Based on my experience, an equity cushion of only 4.7% did not constitute adequate capital at the time of the March 2008 distribution transaction considering the state of the faltering economy, the volatility of the industry and Keywell specifically and the recent and continuing credit crisis in the global banking sector.

*Id.* This conclusion, however, is not supported by any further analysis, by reference to particular prior experiences of the expert, or by citation to any authority on capital adequacy. So, for example, there is nothing indicating—if 4.7% of liabilities was an inadequate equity cushion—what surplus amount would have been adequate and why. With no indication that Keywell was in any financial distress shortly after the tax distribution, the trustee has failed to establish that either distribution was either constructively or actually fraudulent.

   *2. Count III: recharacterization.* Count III relies on both federal and state law as a basis for recharacterizing the NewKey loans as equity contributions. This claim, however, can only be considered under state law. *SGK Ventures,* 521 B.R. at 860-61, gives the reason for this limitation:

> The Bankruptcy Code does not specifically provide for such recharacterization, and the Seventh Circuit has not adopted the decisions of other circuits—such as *Fairchild Dornier GMBH v. Official Comm. Of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation)*, 453 F.3d 225, 233 (4th Cir.2006)— holding that bankruptcy courts have equitable power to order recharacterization. *See In re Airadigm Commc'n, Inc.*, 616 F.3d 642, 657 n. 11 (7th Cir.2010) ("This Court has ... never definitively stated whether we recognize a cause of action for recharacterization."). Indeed, it is unlikely that the Seventh Circuit would find that the equitable power of a bankruptcy court allows treating a creditor's

claim in a manner not stated in the Code. *See In re Fesco Plastics Corp., Inc.,* 996 F.2d 152, 157 (7th Cir.1993) (holding that "a bankruptcy court is ... not authorized to do whatever is necessary to reach an equitable result; it may only do whatever is necessary to enforce the Code.").

The correctness of this rationale was underlined by the Supreme Court's decision in *Law v. Siegel,* 134 S.Ct. 1188, 1195 (2014), holding that a bankruptcy court order was "unauthorized if it contravened a specific provision of the Code." Under § 502(a) and (b) of the Code, a creditor's claim is allowed unless it falls within one of the grounds for disallowance set out in § 502(b). To treat a claim based on a debt an equity contribution is a disallowance of the claim, and the only ground set out in § 502(b) that could encompass this disallowance is § 502(b)(1), which provides for the disallowance of claims to the extent they are "unenforceable against the debtor ... under ... applicable law." *See Grossman v. Lothian Oil, Inc. (In re Lothian Oil, Inc.),* 650 F.3d 539, 544 (5th Cir. 2011) (applying Texas law); *Official Comm. Of Unsecured Creditors v. Hancock Park Capital II, LP (In re Fitness Holdings Int'l, Inc.),* 714 F.3d 1141, 1147-50 (9th Cir. 2013) (remanding for consideration under applicable state law).

Illinois law, like Texas law, allows courts to determine whether a transaction asserted to be a loan should instead be treated as an equity contribution. *Estate of Kaplan,* 384 N.E.2d 874, 881–82 (1978); *see also Kramer v. McDonald's System,* 396 N.E.2d 504, 507 (Ill. 1979) (finding that transfer claimed to be a loan was actually a partnership contribution). The guidance that Illinois offers, however, is sparse. *Kaplan* is the only Illinois decision discussing the standards for recharacterization. *Kramer* affirmed a lower court's decision to recharacterize an asserted debt based on the following findings:

> [N]one of the [challenged] advances were evidenced by a note; no interest was charged on [the debtor's] books; repayment was not expected except out of future profits; [the debtor's] claim for collection would be subordinated to the claims of trade creditors and lenders; and the advances were literally throwing good money after bad.

384 N.E. 2d at 828. In applying the law to these findings, *Kramer* stated that "the general principles articulated in [tax law] decisions . . . are useful in determining the proper accounting treatment," and cites *Raymond v. United States,* 511 F.2d 185 (6th Cir.1975) as an example. *Id.* at 881-82. *Raymond,* in turn, relied on the following factors to recharacterize an asserted loan:

> [N]o notes were ever given to evidence the obligations, and ... the corporation gave them no unconditional promises to repay the obli-

gations at fixed maturity dates or at fixed interest rates. The evidence also disclosed that no security was given for the advances, and that it was unlikely that an outsider would have made such speculative loans. Moreover, it appeared that the corporation was inadequately capitalized and that some of the advances were used to purchase capital assets. Finally, the proofs showed that taxpayers' advances were subordinate to the claims of outside creditors and that repayment of the advances was contingent on the success of the enterprise. . . . [T]he district court could properly consider all these factors in addition to the identity of interest between the creditors and the shareholders and the timing of the advances during the corporation's organization.

*Id.* at 187-88.

Key to the decisions in both *Kramer* and *Raymond*, were deficiencies in loan documentation and treatment. There were no promissory notes, no fixed payment dates, no specification of interest. That foundational basis for recharacterization is not present here. Both the NewKey I and II loans were thoroughly documented, with detailed interest and payment terms, and with the full expectation that they would be paid. Interest consistent with the note terms was paid. And factors that the trustee cites as supporting recharacterization, including the initial plan for the NewKey I cash infusion to have been a purchase of stock in Keywell, is not a consideration consistent supported by *Kramer* or *Raymond.*

It is possible that Illinois courts might adopt a more expansive list of factors for recharacterization, such as set out in *In re Outboard Marine Corp.*, No. 00 B 37405, 2003 WL 21697357, at *5 (N.D. Ill. July 22, 2003), but a federal court is required to apply state law in its present form. *See King v. Damiron Corporation,* 113 F.3d 93, 97 (7th Cir.1997), counseling that "federal courts sitting in diversity ought to be circumspect in expanding the law of a state beyond the boundaries established in the jurisprudence of the state," quoting *Dausch v. Rykse,* 52 F.3d 1425, 1438 (7th Cir.1994) (Ripple, J. concurring, joined by Coffey, J. concurring). Under Illinois law as applied in *Kramer,* the NewKey payments to Keywell were, as documented, loans. The trustee has failed to sustain her claim to the contrary.

3. *Counts IV-VI.* The next three counts of the complaint all seek to avoid the interest payments that Keywell made on the NewKey loans. The basis for these claims is that the loans, if recharacterized, would not have properly generated a right to interest. Because the claim for recharacterization has been

denied, these counts also fail.[16]

4. *Count VII: equitable subordination.* The trustee next seeks equitable subordination of the NewKey loan claims under § 510(c) of the Code, which would allow those claims to be paid only after full payment of other creditor claims. The grounds for equitable subordination are well established: (1) the party against whom subordination is sought has engaged in inequitable conduct, (2) the conduct must have caused harm to other parties with claims, and (3) the subordination does not contradict other policies of the Bankruptcy Code. *See United States v. Noland,* 517 U.S. 535, 538–39 (1996); *In re Kreisler,* 546 F.3d 863, 866 (7th Cir. 2008); *see also Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 703 (5th Cir.1977).

The major dispute between the parties is over inequitable conduct. One basis advanced by the trustee is that the defendants hid the existence of the 2007 and 2008 distributions from Keywell's creditors until claims that the distributions were fraudulent would be time barred. Because the distribution has been found not to be fraudulent, this contention fails. An alternative ground of inequitable conduct is that the defendants contributed cash to Keywell in the form of the secured NewKey I and II loans, rather than as capital contributions, when Keywell was undercapitalized, thus protecting their original equity position at the expense of their trade creditors, whose claims would be paid only after the NewKey loans. The potential inequity here is discussed—and found wanting— in *In re Lifschultz Fast Freight,* 132 F.3d 339, 346 (7th Cir.1997) (citations omitted):

> The trustee argues that "insufficient capital leads to financing the operation with secured debt, and that exposes unsecured commercial creditors to a greater risk of loss." Quite so. But . . . where is the wrong? Creditors extend credit voluntarily to a debtor. The debtor owes no duties to the creditor beyond those it promises in its contract (and beyond whatever common and statutory law may apply). A debtor decidedly does not owe a fiduciary duty to a creditor. And a debtor is just as surely not obliged to be the lender's insurer. A lender will not offer a loan to a borrower unless the rate of return justifies the risk of default or underpayment. The same is true for the sub-class of lenders called trade creditors, for prudent business people assess the risk of default before allowing custom-

---

[16] The trustee suggests that equitable estoppel, discussed below, would also nullify the interest payments under the loans. This is mistaken; equitable subordination, under § 510(c) of the Code, governs by its terms the treatment of a claim within a bankruptcy case, not its treatment under applicable bankruptcy law, and the subsection contains no provision for avoiding interest payments that were proper under applicable nonbankruptcy law.

ers to pay for goods or services on credit.

Accordingly, *Lifschultz* holds that "while undercapitalization may indicate inequitable conduct, undercapitalization is not in itself inequitable conduct." *Id.* at 345. There are, however, several additional considerations that do make the NewKey loans inequitable.

The first has to do with Keywell's business operations. As discussed above, Keywell's dealing in stainless steel without hedging resulted in its earning unusually high income during times of steep market increases, and caused very low earning in times of steep declines in market price. This practice should required a substantial equity cushion if the company was to be protected from extended periods of low income. But instead, Keywell responded to the sharp market increases of 2006-07 by paying to its shareholders virtually all of its earnings for those years—$70 million—in special and tax distributions, leaving the company and its unsecured creditors unprotected against a sharp market decline.

Second, when a sharp market decline did in fact occur in 2008, immediately after the tax distribution, Keywell's management reacted, reasonably, by asking for a capital contribution from its members. Sheffieck suggested $20 million, and the ultimate proposal offered to the shareholders, was for $15 million in preferred stock—about half the tax distribution that the shareholders had received earlier in the year. All of the documentation for this stock issuance was prepared, a private placement memorandum was sent to the shareholders, and a conference call was held with them at which Mark Lozier and Joel Tauber, holders of a 70% ownership share, announced their intent to purchase the stock. Had the transaction gone forward, Keywell would have been adequately capitalized with no harm to trade creditors.

Third, although approved by all of the major shareholders, the transaction never was consummated because of concern that the funds paid for the stock would be lost if BofA would not amend the existing loan agreement and waive Keywell's default. Keywell contacted bankruptcy counsel precisely to address that concern, and only after receiving advice from bankruptcy counsel to "forget equity" did the Keywell change its approach to one involving secured debt. Certainly, in a bankruptcy case, the shareholders would be better situated by holding secured debt, but the equity cushion lost with the tax distribution would now be replaced by diminishing the funds available to support the trade creditors.

Finally, every aspect of Keywell's finances was kept completely confidential from its trade creditors. *Lifschultz* balances the risks taken by a firm's outside lenders by requiring disclosure:

38

> The debtor's books must be open and its debts listed there . . . .
> The presumption of caveat creditor is certainly not absolute. For
> example, the situation could be different for a creditor who does
> not have "a meaningful opportunity given [it] to bargain for higher
> interest rates as compensation for the extreme risk of default."
> Robert C. Clark, *The Duties of the \*347 Corporate Debtor to Its
> Creditors*, 90 Harv. L.Rev. 505, 535-36 (1977)."

132 F.3d at 346. Keywell's policy of strict confidentiality made it impossible for
any of its trade creditors to know about its shareholder distributions, its initial
steps to restore healthy capitalization, or its decision to substitute secured debt.
*Lifschultz* warns that "[f]airness . . . is primarily about disclosure." It was lack-
ing here.[17]

The remaining elements for substantive consolidation are clearly met. By
restoring a measure of capitalization through secured loans rather than re-
placement of equity, the Keywell shareholders diminished the funds available to
pay their unsecured creditors, and subordinating the NewKey I and II loans to
the other creditors' claims contradicts no policy of the Bankruptcy Code.

Judgment will be entered in the trustee's favor on Count VII.

5. *Counts VIII and IX.* The trustee alleges breaches of fiduciary duty by
individuals involved in the management of Keywell and the NewKey entities,
but none of the alleged breaches were proven. To the extent that they are based
on the 2007-08 distributions, there is no showing that these distributions in
themselves were improper. To the extent that they are based on the NewKey
loans, the appropriate remedy has been entered under Count VII. And to the
extent that a claim is made that Keywell should have been placed into bank-
ruptcy sooner, there has been no specification of when the filing should have
taken place and what additional recovery for the estate could have been realized.
Judgment on these counts will be in favor of the defendants.

6. *Count X.* Mark Lozier's $1 million loan to Keywell in 2013 is the sub-
ject of Count X. The trustee does not contest the legitimacy of the loan, made to
prevent a short term cash shortage, but seeks to avoid a lien that Keywell
granted to secure the loan and to recover the payments made on it, both as pref-
erences under § 547(b) of the Code. The factual basis for the allegation is that
the security agreement was not executed until two days after the execution of a
promissory note and payment of the loan proceeds to Keywell. The argument is

---

[17] The defendants argue that there was disclosure of the NewKey I and II
notes through UCC filings, but these would not have disclosed any information
about the distributions, the state of Keywell's capitalization, or the insider sta-
tus of the lenders.

that under these circumstances, the loan was unsecured, and the granting of a later security interest gave Lozier a preference relative to other unsecured creditors; then, with the security agreement invalidated, the payment Lozier received on the note would also be a preference. This claim is defeated by the defense contained in § 547(c)(1) of the Code:

> The trustee may not avoid under this section a transfer—
>> (1) to the extent that such transfer was—
>>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>> (B) in fact a substantially contemporaneous exchange;

Here, as set out in the statement of facts, the note itself stated the intent of the parties that it be secured, complying with the first condition of the defense, and the actual security agreement was executed two days later—and so substantially contemporaneously. See *Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 969 F.2d 321, 328 (7th Cir.1992), finding a much longer gap to be contemporaneous.

Judgment on this count will again be entered in favor of the defendant.

7. *Counts XI: violation of the Illinois Liability Company Act.* The Illinois Limited 805 Ill. Comp. Stat. Ann. 180/25–35(a–b) (West 2014), which establishes a cause of action against those who receive distributions from an LLC that is in a situation of financial distress, as defined in § 25–30 of the Act. Count XI alleges that the 2007–08 equity distributions violated § 25–30. The count fails because the only distributions made to the defendants by Keywell were (1) the 2007-08 distributions, which were not made when Keywell was in distress and (2) interest payments on the NewKey notes, which were appropriate loan payments.

Judgment will be entered for the defendants.

8. *Counts XV: extent of NewKey security interests.* The dispute between the parties over the allegations in Count XV is whether the NewKey security interests extend to the debtor's cash on hand. Because NewKey claims have been equitably subordinated, this dispute is now moot, since the NewKey claims may not be paid before those of the other creditors. However, the only evidence on this issue was that the cash on hand is the proceeds of collateral securing the NewKey claims, and so judgment in favor of the defendants will be entered.

**B. The NewKey complaint**

The NewKey complaint simply seeks to determine the extent of the NewKey claims.  Because these claims are being equitably subordinated, and because the estate will not be sufficient to pay other claims, these matters are moot.

## Conclusion

Judgment will be entered in the adversary proceeding of the trustee, consistent with this opinion, (1) in favor of the trustee on Count VII, ordering equitable subordination of the claims held by NewKey I and NewKey II,  and (2) in favor of the defendants on all of the remaining counts.  The NewKey proceeding will be dismissed as moot.

Dated:  November 30, 2015

Eugene R. Wedoff
United States Bankruptcy Judge